Jonah **OXMAN, Plaintiff–Appellant,**

v.

**WLS–TV, Defendant–Appellee.**

No. 87–2065.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 13, 1988.

Decided May 9, 1988.[*]

---

[*] Because our decision today overrules our prior decision in *Matthews v. Allis–Chalmers,* 769 F.2d 1215 (7th Cir.1985), this opinion has been circulated to the full court. *See* Seventh Circuit Rule 40(f). None of the judges in regular active service voted to hear the case en banc.

Gilbert Feldman, Cornfield & Feldman, Chicago, Ill., for plaintiff-appellant.

Richard C. Bollow, Jenner & Block, Chicago, Ill., for defendant-appellee.

Before BAUER, Chief Judge, and CUDAHY, and COFFEY, Circuit Judges.

BAUER, Chief Judge.

Plaintiff-appellant Jonah Oxman appeals from the district court's grant of summary

judgment in favor of defendant-appellee WLS–TV on his age discrimination claim. *Oxman v. WLS–TV*, 641 F.Supp. 652 (N.D. Ill.1986) ("Oxman III").[1] Oxman argues that the district court erred in concluding that, even if he could make out a prima facie showing of discrimination under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.* ("ADEA"), his proffered evidence failed to create a genuine factual issue that WLS–TV's legitimate reasons for terminating him were pretextual. For the reasons that follow, we reverse the district court and remand for further proceedings consistent with this opinion.

## I.

Oxman worked at WLS–TV for about seventeen years before he was terminated in 1984 at age 61. He has a Bachelor of Arts degree in Radio, a Master of Science degree in Journalism, and, for a time, taught journalism at Roosevelt University in Chicago. Before joining WLS–TV as a newswriter in 1967, Oxman worked as a newswriter-producer at two other Chicago television stations. After working as a WLS–TV newswriter for four months, Oxman became a management employee in WLS–TV's newsroom, supervising the station's four film crews and the newsroom itself in the News Director's absence. In 1968, WLS–TV changed Oxman's title to Business Manager, and his duties expanded to include budgeting, scheduling, purchasing, and handling personnel and legal matters. For a six-month period in 1978, Oxman held an Executive Producer position, though his duties remained the same. Also, during a twenty-week strike in 1977, he worked as a newswriter and Associate Producer, producing two shows daily.

In 1981, WLS–TV established a "Northwest Bureau," the station's first and only satellite bureau, and named Oxman to manage it. Oxman's staff included two camera-crew members and a reporter. As Bureau Manager, Oxman earned more money and took on more journalistic responsibilities than he had as Business Manager, working with the station's assignment desk to develop stories and assure their coverage. Oxman never received any complaints about his performance at the bureau and received annual salary increases. In fact, in December, 1983, just before he was fired, Oxman received a seven-percent salary increase.

In the late summer of 1983, rumors circulated around WLS–TV that then-General Manager Dennis Swanson and then-News Director William Applegate wanted to close the Northwest Bureau as part of a plan to cut costs and improve efficiency at WLS–TV. Swanson, Vice President and General Manager of WLS–TV since July 25, 1983, had ultimate responsibility for all of the station's business operations, including the hiring and firing of station personnel. Applegate, who reported directly to Swanson, was responsible for gathering, producing, and directing news broadcasts. Although the two had discussed closing the Bureau, Oxman was told that a decision to close had not been made and that the company was pleased with his performance as Bureau Manager.

When Swanson assumed the position of Vice President and General Manager in 1983, WLS–TV's ratings were third among the major network stations in Chicago and, in some time slots, WLS–TV ranked fifth in the ratings among Chicago television stations, behind even the city's two major

---

1. Oxman, in his initial complaint, also alleged racial and religious discrimination and sought to bring the action on behalf of a class. *See Oxman v. WLS–TV*, 595 F.Supp. 557 (N.D.Ill. 1984) (*"Oxman I"*) (denying defendant's motion to dismiss the complaint or, at the least, strike Oxman's class allegations). He later amended his complaint to include only his own claim of age discrimination. *See Oxman v. WLS–TV*, 609 F.Supp. 1384 (N.D.Ill.1985) (*"Oxman II"*) (denying defendant's first motion for summary judgment). In *Oxman III*, the district court granted a renewed motion for summary judgment brought by WLS–TV because recent decisions by this court conflicted with the district court's analysis in *Oxman II*, and because Oxman allegedly conceded certain facts in the joint pretrial order that were fatal to his claim. *Oxman III*, 641 F.Supp. at 652. In a fourth unpublished opinion, the district court denied Oxman's motion to reconsider its grant of summary judgment to WLS–TV. *Oxman v. WLS–TV*, No. 84 C 4699 (N.D.Ill., June 12, 1987) [available on WESTLAW, 1987 WL 12688].

independent stations. Swanson believed that WLS–TV suffered from excessive costs, and one of his initial goals was to decrease the station's unnecessary expenses. To do so, Swanson reviewed each of the station's departments to identify and eliminate overstaffing. As part of this staff review, Swanson imposed a hiring freeze to prevent the automatic filling of nonessential positions as they became vacant. In this manner, fifteen vacant positions from various areas and departments of the station, including three positions from the news department, were eliminated from WLS–TV's 1984 budget. In addition, Swanson terminated two news coordinators at WLS–TV's Satellite News Channel when their positions were eliminated as a result of the sale of that channel in October, 1983.

In September, 1983, Applegate reassigned the Northwest Bureau's reporter, Kim Peterson, to do local morning newscasts on the network's "Good Morning America" broadcast, and did not replace her. Without Peterson, the bureau covered fewer stories. Then, in late December, 1983, Swanson decided to close the bureau as of January 27, 1984. At about this same time, Mike Lewellyn, WLS–TV's Director of Personnel, discussed with Oxman the possibility of early retirement, essentially offering him a year's salary to do so. Oxman refused the offer, stating that he was not ready to retire and that he wanted to continue working at WLS–TV.

On January 5, 1984, Applegate told Oxman that the station was closing the Northwest Bureau and that Oxman was going to be fired. In a meeting with Applegate five days later, Oxman reiterated his desire to continue working at WLS–TV in another capacity, but Applegate responded that no positions were available for Oxman. According to Oxman, Applegate told him that the news bureau had grown very complex and that if Oxman took a job as a producer, within a week the station would discover that Oxman could not do the job. Applegate also stated that the station was in the midst of a job freeze, and denied Oxman's suggestion that age was a factor in his termination. On January 27, 1984, WLS–TV closed the Northwest Bureau and

moved the Bureau's camera crew back to the station's downtown Chicago offices. That same day, WLS–TV terminated Oxman.

When WLS–TV told Oxman that he was going to be fired in early January, 1984, there were two vacant newswriter positions in WLS–TV's news department. WLS–TV did not consider Oxman for one of the positions because the station was holding it open for its recently hired news anchor's personal newswriter, who eventually assumed the position on April 18, 1984. For the other vacant newswriter position, which really was that of assignment editor and involved no newswriting, Applegate recommended Mark LaMet, a 24–year–old "vacation relief" newswriter. Swanson rejected Applegate's recommendation, however, and hired a 31–year–old local newspaper editor for the position. In addition, between January 5, 1984 and March 1, 1984, another newswriter position opened at WLS–TV. Oxman was not considered for the job, however, and WLS–TV filled it with a 26–year–old. Also at the time of Oxman's termination, WLS–TV was considering creating a new position called Manager of Scheduling. Oxman was not considered for the position, which became a reality on May 9, 1984, even though he possessed the minimum qualifications required for the job. Oxman alleges that he was qualified for and willing to assume any of these positions.

## II.

The crux of Oxman's complaint is that WLS–TV violated the ADEA when, after it eliminated Oxman's position and terminated his employment, it did not, because of his age, consider him for other available positions for which he was qualified. WLS–TV denies that it acted with discriminatory intent, claiming essentially that Oxman was an unfortunate casualty in the march toward a leaner, more efficient company.

In reaching its decision to grant summary judgment to WLS–TV, the district court found "a lack of evidence that the respon-

sible decisionmaker," Swanson, "had the intent to discriminate on the basis of age." *Oxman III,* 641 F.Supp. at 654. As a result, the court doubted that Oxman could make out a prima facie showing of discrimination under the ADEA and held that, even if Oxman could "sneak by that barrier," he did not proffer enough evidence to create a genuine factual issue "that WLS–TV's legitimate reasons for terminating him were pretextual." *Id.* Oxman argues on appeal that he has made out a prima facie showing of discrimination, and that the district court erred in concluding that his proffered evidence does not create a genuine issue of material fact on the issue of pretext.

### A.

Summary judgment is appropriate when the pleadings and supplemental materials present no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Herman v. National Broadcasting Co., Inc.,* 744 F.2d 604, 607 (7th Cir.1984), *cert. denied,* 470 U.S. 1028, 105 S.Ct. 1393, 84 L.Ed.2d 782 (1985). In determining whether a genuine issue of material fact exists, the court must construe the facts alleged in the light most favorable to the party opposing the motion for summary judgment. *Id.* On review, we consider the entire record in the same light. *Cedillo v. International Ass'n of Bridge & Structural Iron Workers,* 603 F.2d 7, 11 (7th Cir.1979). We therefore must determine whether Oxman has proffered enough evidence to create a genuine issue of material fact that WLS–TV discriminated against him on the basis of his age in violation of the ADEA.

### B.

Congress enacted the ADEA in 1967 to combat arbitrary age discrimination in employment. 29 U.S.C. § 621 (statement of findings and purpose). Under the ADEA, an employer may not refuse to hire, discharge, or otherwise discriminate against any individual between forty and seventy years old with respect to his or her compensation, terms, conditions, or privileges of employment, because of that individual's age. 29 U.S.C. §§ 623(a), 631(a). Thus, a terminated plaintiff's ultimate burden in an age discrimination case is to prove that he was discharged because of his age. *La Montagne v. American Convenience Products, Inc.,* 750 F.2d 1405, 1409 (7th Cir.1984). The plaintiff need not prove that age was the sole factor motivating the employer's decision, only that age was a determining factor in the sense that he would not have been fired but for the employer's motive to discriminate on the basis of age. *Id.*

A plaintiff may prove age discrimination by either of two methods. She may try to meet her burden head on by presenting direct or circumstantial evidence that age was the determining factor in her discharge. *Id.; Ayala v. Mayfair Molded Products Corp.,* 831 F.2d 1314, 1318 (7th Cir.1987). Or, as is more common, she may utilize the indirect, burden-shifting method of proof for Title VII cases originally set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later adapted to age discrimination claims under the ADEA. *Ayala,* 831 F.2d at 1318. Under the *McDonnell Douglas* burden-shifting method, a discharged plaintiff normally can establish a prima facie case of age discrimination by showing (1) that she was in the protected class, (2) that she was doing her job well enough to meet her employer's legitimate expectations,[2] (3) that, in spite of

---

**2.** Because *McDonnell Douglas* involved a claim of discriminatory *hiring,* this second factor originally required that the plaintiff was qualified for the job. However, the more appropriate concern in a discharge case is job performance, into which the question of qualifications merges. We therefore have modified the original *McDonnell Douglas* test in discharge cases brought under the ADEA, *see Kephart v. Institute of Gas Technology,* 630 F.2d 1217, 1219 (7th Cir.1980), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981), in accordance with the Court's instruction that the formulation may vary depending upon specific factual circumstances, *see McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13.

her performance, she was discharged, and (4) that her employer sought a replacement for her. *La Montagne*, 750 F.2d at 1409. Satisfaction of these elements creates a rebuttable presumption of discrimination and shifts the burden of *production* to the defendant to articulate lawful reasons for the plaintiff's discharge. *Id.* Once the defendant articulates a nondiscriminatory, legitimate reason for its actions, the presumption of discrimination dissolves and the burden shifts back to the plaintiff to prove that the defendant's proffered reasons are pretextual. *Id.* The plaintiff can do so by showing either that a discriminatory reason more likely than not motivated the employer or that the employer's proffered explanation is incredible. *Id.*

The *McDonnell Douglas* burden-shifting method of proof serves several important functions. First, it requires the plaintiff to eliminate the most common nondiscriminatory reasons for his termination and distinguish his case from the ordinary, legitimate kind of adverse personnel decision. *Matthews v. Allis–Chalmers*, 769 F.2d 1215, 1220 (7th Cir.1985) (Flaum, J., concurring) (citing *Jayasinghe v. Bethlehem Steel Corp.*, 760 F.2d 132, 134–35 (7th Cir.1985)). In addition, when a plaintiff cannot make out a prima facie case, the employer can avoid unnecessary litigation expense by filing a motion to dismiss, a motion for summary judgment, or a motion for a directed verdict. *Id.* Finally, and most important, in some cases, the method "allows victims of discrimination to prevail without presenting *any* evidence that age was a determining factor in the employer's motivation." *La Montagne*, 750 F.2d at 1409–10 (emphasis in original). For, as we have recognized,

> [a]ge discrimination may be subtle and even unconscious. Even an employer who knowingly discriminates on the basis of age may leave no written records revealing the forbidden motive and may communicate it orally to no one. When evidence is in existence, it is likely to be under the control of the employer, and the plaintiff may not succeed in turning it up. The indirect method [of proof] compensates for these evidentiary diffi-

culties by permitting the plaintiff to prove his case by eliminating all lawful motivations, instead of proving directly an unlawful motivation.

*Id.* at 1410. Thus under the burden-shifting approach,

> if a plaintiff convinces the trier of fact that it is more likely than not that the employer did not act for its proffered reasons, the employer's decision remains unexplained and the inferences from the evidence produced by the plaintiff may be sufficient to prove the ultimate fact of discriminatory intent.

*Ayala*, 831 F.2d at 1319.

### C.

■ The Supreme Court in *McDonnell Douglas* recognized that "[t]he facts necessarily will vary in Title VII cases" and that the specification of the prima facie proof required from the job applicant in that case "is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas*, 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. Not surprisingly, this prediction has proven true not only for Title VII cases, but also for age discrimination cases brought under the ADEA. In particular, courts have run into trouble applying the *McDonnell Douglas* prima facie proof formulation to cases brought by plaintiffs discharged pursuant to a reduction-in-force ("RIF"). *See Matthews*, 769 F.2d at 1217 (7th Cir.1985); *Williams v. General Motors Corp.*, 656 F.2d 120, 128 (5th Cir.1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982). Unlike the typical discharge case, an employer who terminates employees pursuant to a RIF rarely replaces the employees it let go. *Matthews*, 769 F.2d at 1217. An employee challenging his treatment in a RIF case, therefore, cannot satisfy the fourth element of the *McDonnell Douglas* prima facie proof formulation for non-RIF discharge cases—that the employer sought a replacement for him. This creates a problem, because the first three elements of the prima facie proof formulation cannot, standing alone, create a presumption of discrimination. In other words, because

the ADEA merely mandates that an employer reach employment decisions without regard to age and does not require that an employer accord special treatment to members of the protected age group, *Williams*, 656 F.2d at 129, the fact that a protected employee who was performing his job well was fired cannot, by itself, trigger a presumption of discrimination under the ADEA. There has to be something more—an additional showing that creates an inference of discrimination such as that created by an employer that fires an older employee who was performing adequately and *then* seeks a replacement.

In an attempt to repair the damage that the RIF scenario inflicts upon the traditional prima facie proof formulation, this and other courts have employed a modified formulation in cases brought by plaintiffs terminated pursuant to a RIF. In *Matthews, supra*, we adopted the Fifth Circuit's prima facie proof formulation for RIF cases, holding that such a plaintiff

> can establish a prima facie case under the ADEA by (1) showing he was within the protected age group; (2) showing he was adversely affected, either through discharge or demotion; (3) *showing he was qualified to assume another position at the time of the discharge or demotion; and (4) producing circumstantial or direct evidence from which a factfinder might reasonably conclude that the employer intended to discriminate in making the employment decision in issue.*

*Matthews*, 769 F.2d at 1217 (citing *Williams*, 656 F.2d at 129) (emphasis added). Neither the Fifth Circuit in *Williams*, this court in *Matthews*, nor any other circuit using this approach, has explained the rationale behind the new third element, which replaces the non-RIF requirement that the employee was performing well enough to meet the employer's legitimate expectations. (Although it necessarily assumes the existence of other open, available positions at the time of the plaintiff's termination.) The Fifth Circuit in *Williams* did, however, elaborate on the new fourth element. According to that court, it

simply insists that a plaintiff produce some evidence that an employer has not treated age neutrally, but has instead discriminated based upon it. Specifically, the evidence must lead the factfinder reasonably to conclude either (1) that defendant consciously refused to consider retaining or relocating a plaintiff because of his age, or (2) defendant regarded age as a negative factor in such consideration.

*Williams*, 656 F.2d at 129–30. Thus, by requiring some showing of discriminatory intent on the part of the employer, the new fourth element is supposed to put back into the prima facie proof formulation what the unique circumstances of the RIF took out of it—the presumption that the employer discriminated against the employee on the basis of age.

But this formulation for RIF cases goes too far. First, and somewhat obvious, its practical starting point is the employer's claim that the plaintiff was terminated pursuant to a RIF (or the plaintiff's anticipation of that claim), not the plaintiff's attempt to establish a prima facie case. This alone seems to stand the *McDonnell Douglas* approach on its head—in effect, requiring the employee to rebut the employer's putatively legitimate, nondiscriminatory reason for its actions, not the other way around. In addition, the modified RIF formulation, as a practical matter, transforms the burden-shifting method of proof into the more difficult direct method. By requiring the plaintiff to produce some evidence of discriminatory intent on the part of the employer to make out a prima facie case, the RIF formulation at the very least fuses the "prima facie" and "pretext" steps of the *McDonnell Douglas* method. At worst, under this prima facie proof formulation for RIF cases, a victim of discrimination no longer can prevail without producing *any* evidence that age was a determining factor in the employer's motivation. The modification thus obviates the central purpose behind the *McDonnell Douglas* method, which is to relieve the plaintiff of the burden of having to uncover what is very difficult to uncover—evidence of dis-

criminatory intent. Thus, although the *Williams* modification of the prima facie proof formulation which we adopted in *Matthews* purports to apply the *McDonnell Douglas* burden-shifting method of proof to RIF cases, it in fact discards that method.

Not only is the application of the *Matthews* prima facie proof formulation therefore questionable, it also is unnecessary to protect an employer from specious claims. For a plaintiff who brings an age discrimination suit after being discharged pursuant to a RIF usually does not dispute that economic reasons played a role in the employer's decision. Rather,

> [a] plaintiff in a RIF situation ... typically will allege that the employer retained younger employees who continued to perform either work that the plaintiff had performed, or work for which the plaintiff was qualified, after the plaintiff's discharge.

*Matthews*, 769 F.2d at 1222–23 (Flaum, J., concurring). And, in this context,

> an employer's retention of a younger employee either in the same job as the discharged plaintiff or in another job for which the plaintiff also was qualified gives rise to an inference of discrimination that is no weaker than the well-recognized inference created when an employer discharges an employee who is performing adequately and then seeks and/or obtains a replacement.

*Id.* at 1223; *see also, Ayala*, 831 F.2d at 1320 (concluding in RIF case "that the jury reasonably could have found that, while the decision to close the rubber division was not itself based on age discrimination, Mayfair's refusal to allow the discharged workers to bump others with less seniority in the plastics division and Mayfair's hiring of younger workers when jobs became available after the plaintiffs were discharged constituted discrimination based on age.") (footnote omitted).[3]

A terminated employee within the protected age group who can show that *others not in the protected class were treated more favorably*, therefore, should not be required to uncover evidence of discriminatory intent on the part of the employer to make out a prima facie case of discrimination under the ADEA. Such a showing is enough to create a reasonable inference under *McDonnell Douglas* that age was a determining factor in the employer's decision. *See Duffy v. Wheeling*, 738 F.2d 1393, 1395 (3d Cir.) (using this approach in a RIF case), *cert. denied*, 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984); *Massarsky v. General Motors Corp.*, 706 F.2d 111, 118 & n. 13 (3d Cir.) (same), *cert. denied*, 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983); *see also Coburn v. Pan American World Airways, Inc.*, 711 F.2d 339, 342–43 (D.C.Cir.) (requiring only that plaintiff show she was "disadvantaged in favor of a younger person"), *cert. denied*, 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed. 2d 683 (1983). We therefore hold that Oxman can establish a prima facie case by showing that he was within the protected age group, that he was performing according to his employer's legitimate expectations, that he was terminated, and that others not in the protected class were treated more favorably. This formulation merely requires an employer that releases a protected employee while simultaneously hiring (or not "bumping") younger employees to fill positions for which the older employee was qualified to explain its actions without forcing the protected employ-

---

**3.** Also, in another case similar to this one, *Parker v. Federal Nat'l Mortgage Ass'n*, 741 F.2d 975 (7th Cir.1984), we concluded that the plaintiff would have had little difficulty establishing a prima facie case of age discrimination at trial based upon his discharge pursuant to a small-scale RIF that eliminated his job position where the evidence showed that he was within the protected age group, that he was a "competent and respected" employee, and that several younger employees who had held the same positions as the plaintiff were permitted to transfer into other positions for which the plaintiff was also qualified. *Id.* at 979. Thus, although *Parker* was literally a RIF case, we nevertheless indicated that no showing of discriminatory intent on the part of the employer was required as part of the prima facie case formulation, implicitly recognizing that the treatment of an employee whose position is eliminated pursuant to a RIF can give rise to an inference of discrimination when he or she is disadvantaged in favor of younger persons.

ee to uncover that elusive "smoking gun." For that reason, it is more consistent with *McDonnell Douglas* than *Matthews*, which we now overrule.

### III.

█ Under this formulation, Oxman has made out a prima facie case. WLS–TV does not dispute that Oxman was a member of the protected group, that he was performing his job up to the legitimate expectations of his employer before he was terminated, and that he was terminated. Additional evidence, *viewed in the light most favorable to Oxman,* also shows that, at the time Oxman was terminated, at least two vacancies existed in the newsroom at WLS–TV, that Oxman expressed his desire to assume at least one of these positions, that he had the experience and qualifications to handle them, and that WLS–TV filled them with persons younger than Oxman.

We also find that WLS–TV has rebutted Oxman's prima facie case with legitimate, nondiscriminatory reasons for his termination, satisfying its burden of production. WLS–TV explains that Oxman's position at the Northwest Bureau was eliminated as part of a structural reorganization designed to cut costs and increase efficiency. WLS–TV claims that, although the news crew was still needed, Oxman was not and his job position therefore had become superfluous. According to WLS–TV, the reason Oxman was the only one in his position terminated is because the bureau was the only one of its kind. In addition, WLS–TV has produced evidence that in October, 1983, two other younger employees—aged 26 and 32—of WLS–TV's "Satellite News Channel" were fired after the sale of that channel eliminated their positions, indicating that Oxman was not the only employee adversely affected by the company's restructuring. WLS–TV also has offered plausible reasons for not placing Oxman in other positions open at the time of his termination. The company argues that some positions already were filled, and that Oxman was not the best person for the jobs. WLS–TV clearly has shifted the bur-

den back to Oxman to prove that WLS–TV's reasons are pretextual.

This case thus turns on whether Oxman proffers enough evidence suggesting that WLS–TV's reasons are pretextual to survive the latter's motion for summary judgment. To do so, Oxman must produce evidence that WLS–TV's decision to terminate Oxman and not allow him to transfer to another open position more likely than not was motivated by discriminatory reasons or that its proffered explanations are unworthy of credence. *La Montagne,* 750 F.2d at 1409. Oxman's first piece of evidence on this point is Applegate's statement to Oxman during their January 10, 1984 meeting that

> the business had grown very complex in recent years and that producers were under great pressure. [Applegate] said that if he made [Oxman] a producer on one of the shows, they'd know within a week that they'd find [Oxman] unable to do the job and that [Oxman] would then still be out of a job. Applegate denied [Oxman's] suggestion that age was a factor in the decision.

Oxman argues, and the district court found in *Oxman II* that, although Applegate's statement concerned a producer rather than a newswriter position, it creates a reasonable inference that Applegate believed that Oxman could no longer handle the fast-paced TV news business because of his age. WLS–TV argues that, under this court's opinion in *La Montagne,* Applegate's statement is irrelevant because the discriminatory intentions and remarks of Applegate cannot be attributed to Swanson, who made the decision to discharge the employee.

We disagree. In *La Montagne,* we held that statements made by two officers of the employer inferior to the official who made the termination decision were not probative of the discharging official's intent and that this evidence, standing alone, could not support a reasonable jury finding that the discharging official had intended to discriminate. *La Montagne,* 750 F.2d at 1412. In *La Montagne,* the inferior officers' statements were made prior to the

decision to discharge and were apparently not communicated to the discharged employee during any discussion of his termination; the discharging official alone made the decision and carried it out. Here, on the other hand, Swanson made the decision but Applegate carried it out. It was Applegate who told Oxman of his discharge, and the allegedly discriminatory statement was made during that meeting *after* Swanson's decision to discharge Oxman. Applegate was thus carrying out Swanson's orders and it is reasonable to infer that the reasons given by Applegate were those authorized by Swanson. While such an inference is not mandated, it is reasonable and is supported by substantial evidence. *See Coston v. Plitt Theatres, Inc.*, 831 F.2d 1321 at 1326 (7th Cir.1987).

Other evidence also supports Oxman's showing of pretext, as the district court pointed out in *Oxman II:*

First, Swanson's hiring freeze was not absolute, but rather was subject to considerable discretion. While he eliminated seventeen positions after they became vacant, he also hired some fifteen people—aged 24–44—including several from within WLS–TV, to fill other vacancies between September, 1983 and September, 1984. Thus, Swanson's cost-cutting was highly selective and seems to have hit Oxman harder than other, younger employees. Second, as for WLS–TV's argument that two other employees were not rehired when their positions were eliminated … those employees were not newsroom employees. WLS–TV has admitted that since January 1, 1981, Oxman has been the *only* employee among reporters, writer-producers or newsroom management fired because of station reorganization or the closing of a department, bureau, or other subdivision. Thus, despite WLS–TV's admitted four million dollar deficit and its desire to cut costs, Oxman stands alone as the only qualified newsroom employee terminated because of reorganization.

*Oxman II,* 609 F.Supp. at 1394.

We therefore hold that Oxman has proffered enough evidence to create a genuine issue of material fact that WLS–TV's proffered reasons for terminating him were pretextual, and reverse the district court's grant of summary judgment to WLS–TV.

REVERSED AND REMANDED.