Dawn **VEATCH**, Plaintiff,

v.

**NORTHWESTERN MEMORIAL HOSPITAL**, Defendant.

No. 88 C 6129.

United States District Court, N.D. Illinois, E.D.

Jan. 4, 1990.

---

George W. Gessler, Gessler, Flynn, Laswell, Fleischmann, Hughes & Socol, Ltd., Chicago, Ill., for plaintiff.

Lawrence C. DiNardo and Patricia J. Hruby, Seyfarth, Shaw, Fairweather & Geraldson and Anne M. Haule, Northwestern Memorial Hosp., Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiff Dawn Veatch (Veatch) filed this action against defendant Northwestern Memorial Hospital (the hospital) alleging that on November 8, 1987, after sixteen years of employment by defendant, she was summarily fired by her supervisor, Katherine Vestal. In counts I and II of her first amended complaint Veatch alleges that her firing violated Title VII of the Civil Rights

Act of 1964 and the Age Discrimination in Employment Act (ADEA).[1] The remaining counts are pendent claims based on state law. Count III seeks damages for breach of contract, and count V for defamation.[2] The defendant moves for summary judgement on all counts. For the following reasons, that motion is denied in part and granted in part.

## FACTUAL BACKGROUND

After her initial employment in 1972 as a staff nurse in the hospital's department of psychiatry, plaintiff rose rapidly in rank. She became a supervisor in a year, moved up to assistant director in 1976, and became director of psychiatric nursing in 1977. Plaintiff remained in that position until her summary discharge a decade later. At the time of her discharge plaintiff was earning $59,155 a year, the top salary in the hospital's range for her position.[3]

As director of psychiatric nursing plaintiff managed the support staff in six departments or "cost centers" within the Institute of Psychiatry. This included Department 453, the Adolescent Psychiatry Unit. Plaintiff was also responsible for planning, which included calculating budgets and hiring and training employees.

Plaintiff's immediate supervisor was the hospital's vice-president of nursing. On July 15, 1987, the hospital hired a new manager, Katherine Vestal, to fill that supervisory position. Vestal's supervisor was Kathleen Murray, senior vice-president. Plaintiff had been working under Vestal for less than five months when she was discharged.[4]

Plaintiff also had a "dotted line" reporting relationship with Dr. Harold Visotsky, the Director of the Institute of Psychiatry. Plaintiff worked closely with Visotsky, served with him on the Institute's steering committee, and was the only woman on that leadership body.

Plaintiff asserts that she was fired because she is a woman, because of her age, and without just cause. The hospital responds that plaintiff was fired for a legitimate non-discriminatory reason that also constitutes just cause. The hospital contends that plaintiff was insubordinate and violated a clear order of her immediate superior, Katherine Vestal. The alleged insubordination relates to plaintiff's hiring of mental health workers. Though the hospital contends that plaintiff was not authorized to hire these workers, plaintiff denies that she was insubordinate.

To resolve the claims of age and sex discrimination, we must explore some of the facts regarding the hiring of these workers. These facts are relevant to plaintiff's contention that the official reason for her discharge, insubordination, is not the real reason she was fired. For counts I and II, therefore, we are interested in whether the supervisor who made the firing decision actually believed that Veatch was insubordinate.

To resolve the contract claim, we must delve perhaps even more deeply into the facts surrounding the hiring of the mental health workers. Here, the issue is not whether Vestal believed Veatch was insubordinate. Instead, the issue is whether Veatch was actually insubordinate. Some facts that are relevant to the contract claim may be irrelevant to the age and sex discrimination claims because facts unknown to Vestal at the time of the firing decision do not advance our inquiry into her motivation.

This case turns partly on what was happening when the plaintiff hired some additional mental health workers in the fall of 1987. Plaintiff wrote up a proposal to in-

---

1. Our copy of plaintiff's first amended complaint actually contains nothing labeled count II but instead labels both the age discrimination and contract claims as count III. We will refer to the age discrimination count as count II.

2. We dismissed count IV, which asked for punitive damages for breach of contract, in our Memorandum and Order of May 8, 1989.

3. Plaintiff asserts that her fringe benefits added an extra 22% to her earnings. We have found no support for this assertion in the record.

4. Vestal herself stayed at the hospital only until June, 1988.

crease the staff of the Adolescent Psychiatry Unit. She wanted to add additional mental health workers. Before this proposal was approved, the hospital contends, plaintiff began to implement her plan. Plaintiff asserts that she was not prematurely implementing her proposal for additional staff. She says she was hiring replacements for workers who were expected to leave.

Plaintiff's evidence, referred to in her statement of facts submitted under Local Rule 12(m), shows that this dispute over the hiring of mental health workers occurred in the midst of already intense administrative pressure to reduce costs in the Institute of Psychiatry. Mr. Gary Mecklenburg became defendant's president and chief executive officer in July, 1985. He found a budget that was out of balance and spent considerable time trying to cut expenses. Mecklenburg was convinced that major efforts were necessary to reduce expenses in the Institute of Psychiatry, which had significant deficits. Throughout 1986 and 1987, administrators pushed to cut the Institute's expenses. There was considerable friction between the hospital administration and the Institute of Psychiatry, based on money, and the administrators believed the Institute staff was overpaid (plaintiff's 12(m) statement of facts, no. 16). During the year and a half before plaintiff was fired, there was increasing pressure within the hospital to cut costs. The Institute of Psychiatry was one principal target of this pressure.

The hospital's fiscal year begins on September 1 and ends on August 31. Dr. Visotsky serves on both the hospital's board of trustees and the budget committee. He was excluded, however, from the administrative process that determined the budget for the fiscal year that began in September, 1987. The number of "patient days" assigned to hospital departments underlies the calculations that determine each department's budget for staffing, salaries, and other expenses. In preparing the budget for the fiscal year that began in September, 1987, the hospital reduced the Institute of Psychiatry's patient days by 1,000.

The hospital describes the number of staff in each department or cost center in terms of full-time equivalents, known as FTEs. Each FTE represents a full-time worker, though a budgeted FTE can be filled with several part-time workers. For the fiscal years that began in September 1987 and 1988, the budget provided for 48 FTEs for the Adolescent Psychiatry Unit.

The hospital asserts that a manager of plaintiff's rank can add additional FTEs, beyond the number included in the budget, only with the prior approval of her supervisor, who would be Vestal in this case (defendant's 12($l$) statement, no. 5). In response, plaintiff denies that such a clear rule existed. Further, she points out that there is a crucial difference between adding to the number of FTEs and hiring replacement workers, which is what plaintiff contends she was doing. Hiring replacement workers, plaintiff contends, can temporarily raise the FTE count for a given reporting period, even without hiring for unbudgeted positions.

On October 13, 1987, plaintiff met with Vestal, presented graphs and figures, and proposed adding additional FTEs to the Adolescent Unit's budget.[5] Plaintiff explained the high rate of burn-out in the Adolescent Unit, the consequent high rate of turnover, the need to orient new workers, the problems in obtaining replacements, and safety problems caused by inadequate staff. Vestal responded by asking plaintiff to first verify her calculations with the fiscal department and then prepare a written proposal. Although Vestal did not approve the proposal at this October 13

**5.** In her response to defendant's 12($l$) statement, no. 13, plaintiff asserts that during the earlier budget preparation process, Senior Vice-President Kathleen Murray reduced the number of patient days used in calculating the Unit's needs. At the time, the plaintiff asserts, the vice-president suggested later adjustments could easily be made if needed. When meeting with Vestal on October 13, the plaintiff informed Vestal of the senior vice-president's earlier comments encouraging the plaintiff to suggest revisions to the budget if they proved necessary. *See* Veatch deposition at 188–89.

meeting, plaintiff says that Vestal expressed an attitude of support. Vestal said she understood the problems in the Adolescent Unit and did not disagree with plaintiff's assumptions and figures. The fiscal department verified plaintiff's calculations, and sometime after October 30, 1987, plaintiff submitted a written proposal to add 12.5 FTEs to the Adolescent Unit's budget.

The next discussion of the proposal occurred during a regular meeting between plaintiff and Vestal on November 20, when Vestal told plaintiff that she would have time over Thanksgiving to review it. At this meeting Vestal asked plaintiff about the amount of money being paid for staff, because the Institute of Psychiatry exceeded its October budget. Plaintiff explained a variety of factors that contributed to that situation, including the fact that some newly-hired staff were undergoing orientation and could not yet be assigned to patients. Vestal asked how orientation could be occurring since the proposal for additional positions had not been approved. Plaintiff replied that she had hired new staff for the Adolescent Unit to "address the attrition problem" while she waited for Vestal to review the proposal. Vestal was angry that plaintiff was orienting new staff and said she would have to do some thinking.[6]

The following Monday, November 23, Vestal asked for a list of "overhires" in the Adolescent Unit. Plaintiff asked her payroll coordinator to compile a responsive document. She reviewed the document, made some additions, and sent it to Vestal the same day. Defendant asserts that this document, Veatch Dep. Exhibit 16, listed fourteen people as "overhires" in the Adolescent Unit. Plaintiff vigorously disputes

the meaning of Exhibit 16 and points out that "overhires" was Vestal's term and that she did not define it. Plaintiff says the document merely lists persons hired within the preceding several weeks. Five are listed as "10–hour" staff, but workers in that category serve as standby resources and are not actually on the payroll. Only two persons on the list were hired between October 13 and November 20, thus refuting, according to plaintiff, any conclusion that plaintiff hired for unbudgeted positions in defiance of instructions Vestal claims to have issued in the October 13 meeting (plaintiff's response to defendant's 12($l$) statement, no. 21).

To correct the document she sent to Vestal on November 23, plaintiff sent Vestal some additional information, represented by Veatch Dep. Exhibit 17, on December 2, 1987. Plaintiff pointed out that the "10–hour" people were really zero-hour employees and should be dropped from the list of overhires. She contends that Exhibit 17 shows that she made no attempt to hire for unbudgeted positions (plaintiff's response to defendant's 12($l$) statement, no. 22).

In her deposition, plaintiff testified that she hired approximately seven people in October and November, 1987, though she asserts that this hiring was independent of the pending proposal to add new positions (Veatch dep. at 327–30).

After receiving the report on "overhires" from plaintiff on November 23, Vestal asked John Loya, vice-president of human resources, for a list of employees who had been hired in the Adolescent Unit since September 1, 1987.[7] Vestal received a re-

---

6. In defendant's 12($l$) statement, no. 18, the defendant asserts that the record shows that Vestal became angry that new staff were being oriented even though plaintiff's proposal had not been approved. Plaintiff denies that the record shows that Vestal's anger was linked to the fact that the proposal was not yet approved (plaintiff's response, no. 18). Plaintiff contends she made it clear to Vestal that the hiring to compensate for attrition was separate from the pending proposal to add additional FTEs (plaintiff's response, no. 16). Both parties refer to the Veatch Dep. at 205–08.

7. The Defendant's 12($l$) statement asserts that Vestal asked for this list "in order to determine the rate of hiring in the Unit after [Vestal] had directed plaintiff that they could not add unauthorized positions." Plaintiff denies that Vestal "directed" the plaintiff not to add "unauthorized positions." Plaintiff also points out that such an instruction, if it had in fact been given in the October 13 conversation, would be violated only by hires occurring later. Therefore, the plaintiff contends, Vestal's request to Loya could not have been made "to determine the rate of hiring after [Vestal] had directed plaintiff" on October 13 (plaintiff's response, no. 24).

sponse on December 3. The parties do not agree on the meaning of this response, which is Vestal Dep. Exhibit 3. According to the defendant, the list showed "continued hiring activity" in September, October and November in Department 453 (defendant's 12(*l*) statement, no. 25). Plaintiff points out that this exhibit reveals only when the workers started putting in hours; it does not reveal their hiring date, which could be much earlier. Plaintiff also disputes defendant's characterization of the hiring as "continued," as though it were a violation of an instruction, an instruction that plaintiff contends was never given.

The financial planning department prepares position control reports for each of the hospital's cost centers. Department managers receive the report for their areas of responsibility. This report shows the budgeted and actual number of FTEs for each cost center. Plaintiff regularly received the position control reports for the six cost centers in the Institute of Psychiatry, including the Adolescent Unit. The parties disagree about how frequently these reports are issued. An indeterminate time lag affects the accuracy of each report. Gary Fennessy of Financial Planning testified that he could not vouch for the accuracy of these reports.

Defendant asserts that Vestal reviewed the position control reports for Department 453 to determine the budgeted and actual number of FTEs, and to investigate further the existence of overhires in the Unit (defendant's 12(*l*) statement, no. 26). Plaintiff agrees that Vestal claims to have reviewed these reports but appears to challenge both Vestal's credibility and the reasonableness of Vestal's reliance on them if she did in fact review them. Vestal testified that she did not normally receive these documents, that she didn't keep the ones she claims to have reviewed, could not describe their contents, could not testify about what they disclosed, and did not know if they were accurate (plaintiff's response to defendant's 12(*l*) statement, no. 26).

According to defendant, eighteen position control reports were issued for the Adolescent Psychiatry Unit between the beginning of 1987 and the date plaintiff was fired. These reports contain figures that purport to show the actual and budgeted numbers of FTEs on various dates. While the budgeted number of FTEs remained constant at 48, these figures depict the actual number of FTEs fluctuating between a low of 43.6 at the beginning of 1987, moving up to 54.4 by June, dropping to the low 50s over the summer, increasing in steps to a high of 59.2 in the report dated October 17, then dropping again.[8] While plaintiff admits that the position control reports contained these numbers, she disputes their significance.[9]

---

**8.** The figures show the following fluctuations over time:

| | budgeted FTEs | actual FTEs |
| --- | --- | --- |
| January 1 | 48 | 43.6 |
| January 24 | 48 | 43.6 |
| February 7 | 48 | 44.6 |
| February 21 | 48 | 44.6 |
| March 7 | 48 | 44.2 |
| March 21 | 48 | 45.2 |
| April 18 | 48 | 47.2 |
| May 30 | 48 | 53.8 |
| June 27 | 48 | 54.4 |
| July 11 | 48 | 48.8 |
| July 23 | 48 | 50.8 |
| August 8 | 48 | 51.8 |
| September 5 | 48 | 51.2 |
| September 19 | 48 | 53.2 |
| October 3 | 48 | 55.2 |
| October 17 | 48 | 59.2 |
| November 14 | 48 | 57.6 |
| November 28 | 48 | 56.35 |

(Defendant's 12(*l*) statement, no. 29; Fennessy Aff., ¶ 13.)

**9.** The plaintiff argues that these figures are misleading. The plaintiff disputes any suggestion that Vestal reviewed these figures before firing the plaintiff (plaintiff's response, no. 29). While Vestal claims to have reviewed "position control reports," the defendant has not specified which particular reports she reviewed nor the time span involved. These figures thus are not relevant to the question of Vestal's motivation at the time she fired the plaintiff.

Even though the figures may be somewhat inaccurate, they are nevertheless relevant to the question whether there were actually overhires, and this relates to whether the plaintiff was actually fired for just cause. Here, the plaintiff presents evidence that month-to-month fluctuations are normal and that Fennessy from Financial Planning never noticed anything unusual as he monitored the performance of Department 453's budget.

Defendant asserts that when Vestal discovered what she viewed as overhiring, she consulted with various supervisors about what to do. Plaintiff disputes many of defendant's assertions along this line. There are genuine issues of fact about whether Vestal conducted the investigation that she says she conducted, whether she even talked with some of the people she claims to have consulted, whether the supervisors she actually talked to really ratified her decision in the manner Vestal suggests, and whether Vestal properly followed hospital disciplinary procedures. The issue in a motion for summary judgment is whether there are genuine issues of *material* fact. Some of these questions are material to the issue of pretext in the federal discrimination claims because questions about whether Vestal acted reasonably relate to whether she is being honest about firing plaintiff for the reasons she advances. Others are material to plaintiff's claim in contract, which asserts that required disciplinary procedures were not followed.

Vestal scheduled a meeting with plaintiff for Monday, December 7, 1987. Plaintiff alleges that at this meeting Vestal stated that the Institute of Psychiatry needed to be revamped and suggested that plaintiff was the wrong person to supervise such a restructuring because "that would be like asking a mother to change the children that she has raised" (Veatch dep. at 278). Plaintiff offers Vestal's statement as evidence of age discrimination and as evidence that plaintiff's alleged insubordination was not Vestal's real reason for the discharge. In her deposition, plaintiff recounted more of the December 7 conversation. Vestal argued that plaintiff should not continue working at her job. Plaintiff disagreed and insisted that she could adjust to any changes that needed to be made and had done so several years earlier when a new clinical director came in. Vestal also said she disapproved of plaintiff's hiring of extra mental health workers, though she didn't produce any documentation about alleged overhires (Veatch dep. at 278–82). At the meeting's end, Vestal said she

would make a final decision whether to fire plaintiff on Wednesday, December 9.

Vestal did not wait until December 9. On December 8 she ordered plaintiff to leave a meeting and proceed immediately to Vestal's office. According to plaintiff, Vestal said she was making her decision early because Dr. Visotsky was "interfering" (Veatch dep. at 292–93). Vestal declared that plaintiff was discharged for insubordination and ordered plaintiff to be out of her office by the end of the day. *Id.*

Plaintiff challenged her discharge through the hospital's grievance procedure. At each step administrators affirmed Vestal's decision. Plaintiff asserts that higher supervisors did not independently investigate the facts but simply affirmed her discharge by uncritically accepting Vestal's view that plaintiff filled unbudgeted positions in defiance of Vestal's orders. If plaintiff can establish that particular disciplinary procedures were part of the terms of her employment, then this assertion may be relevant to the plaintiff's claim in contract.

Plaintiff was forty-five years old when she was fired. On May 2, 1988, the hospital filled plaintiff's position by promoting Diane Friedman, clinical nurse manager in the Adolescent Unit, who was forty-six at the time. Her starting salary was $52,368.

## DISCUSSION

The court may grant summary judgment only if the pleadings, depositions, answers to interrogatories, admissions and affidavits "show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court must consider the evidence, and any reasonable inferences drawn therefrom, in the light most favorable to the non-moving party. *See Box v. A & P Tea Co.*, 772 F.2d 1372, 1375 (7th Cir.1985). Here the plaintiff is the non-moving party and we must consider the evidence in the light most favorable to her.

## A. *Counts I and II*

Plaintiff's age and sex discrimination claims come to us under a theory of disparate treatment. The key question is whether plaintiff's sex or age was a substantial factor in Vestal's decision to fire her. *See Price Waterhouse v. Hopkins,* — U.S. ——, 109 S.Ct. 1775, 1795, 1797, 104 L.Ed.2d 268 (1989) (White, J., and O'Connor, J., concurring). Resolving that question requires an inquiry into the mind of the decisionmaker. Ordinarily, summary judgment is particularly inappropriate when motivation and intent are material issues. *See Munson v. Friske,* 754 F.2d 683, 690 (7th Cir.1985) (summary judgment usually improper when case involves weighing of conflicting questions of motive and intent). Even in a discrimination case, however, summary judgment can be proper if the plaintiff fails to produce any evidence of discriminatory intent. *Id.*

In a discriminatory treatment case the plaintiff may prove her case either directly or indirectly. As open admissions of discriminatory intent are rare today, the most common method of proof is indirect and circumstantial. The Supreme Court laid down a framework for such indirect proof in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and elaborated on it in *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Courts apply this framework to assess a plaintiff's indirect proof of age discrimination as well as sex and race discrimination. *See Mechnig v. Sears, Roebuck, & Co.,* 864 F.2d 1359, 1364 (7th Cir. 1988). The plaintiff must first establish a *prima facie* case of discrimination by a preponderance of the evidence. The *prima facie* case, once established, creates a rebuttable inference that the employer based its action on an impermissible factor. The employer can rebut that inference of discrimination by articulating a legitimate

non-discriminatory reason that explains the challenged action. The plaintiff must then have the opportunity to prove, by a preponderance, that the legitimate reasons the employer offered were not its true reasons and were thus a pretext for discrimination. *Burdine, supra,* 450 U.S. at 252–53, 101 S.Ct. at 1093. Although the plaintiff retains the burden of persuading the factfinder that she is the victim of intentional discrimination, she can prove this ultimate issue indirectly by establishing that the non-discriminatory explanation proffered by the employer is not credible. *Id.* at 256, 101 S.Ct. at 1095.

The Supreme Court has said that in a disparate treatment case the plaintiff's initial burden of proving a *prima facie* case is "not onerous." *Id.* at 253, 101 S.Ct. at 1093. To establish a *prima facie* case of a discriminatory refusal to hire, the Supreme Court has required only that plaintiffs show they belong to a class protected by Title VII, that they were qualified for the job, and that the employer continued seeking applications after rejecting the plaintiffs.

■ Courts have tailored the *McDonnell Douglas* test to fit cases where already-employed plaintiffs challenge an adverse action taken by their employer. Plaintiffs who are over forty, and thus members of a class protected by the ADEA, establish a *prima facie* case simply by showing that they were adequately performing their job, that they were fired, and that their employer sought a replacement. *Oxman v. WLS–TV,* 846 F.2d 448, 454 (7th Cir.1988).[10] The cases in this circuit have disagreed over whether courts should also require plaintiffs to show that the employer replaced them with younger staff. *See Mechnig v. Sears, Roebuck, & Co.,* 864 F.2d 1359, 1364 n. 5 (7th Cir.1988). In discrimination cases the key issue is whether an impermissible factor governed an employer's decision at the time the decision was made. *See Price*

---

**10.** Defendant cites an inapplicable portion of the *Oxman* case for the proposition that the plaintiff must also show that other employees who were not in the protected class received more favorable treatment (memorandum in support of defendant's motion to dismiss

and/or for summary judgment, at 9). That section of the *Oxman* opinion delineates the *prima facie* case in so-called reduction-in-force cases, where the employer did not seek a replacement for the plaintiff's job.

*Waterhouse v. Hopkins,* —— U.S. ——, 109 S.Ct. 1775, 1785, 104 L.Ed.2d 268 (1989). Because we believe that the identity of plaintiff's eventual replacement is not crucial to the initial showing of discrimination, we apply the test articulated in *Oxman.*

■ Because similar standards for evaluating the *prima facie* case apply to charges of sex discrimination, women establish a *prima facie* case of sex discrimination under Title VII by showing that they were adequately performing their job, were fired, and that the employer sought a replacement.

In this case the plaintiff has established a *prim⌣ facie* case of both age and sex discrimination. She is female and within the age group protected by the ADEA. She offers evidence that she performed her job according to her employer's legitimate expectations.[11] She was discharged, and the defendant sought and hired a replacement.

■ The defendant maintains that plaintiff has no claim of sex discrimination because the firing decision was made by another woman and her replacement was also female (Memorandum in Support of Defendant's Motion to Dismiss and/or for Summary Judgment, at 7). This position reflects a misunderstanding of the laws against discrimination and the evils they were enacted to combat. The fact that a woman fired a woman or a black fired another black does not demonstrate that the supervisor's decision was free of the racial and gender stereotyping that federal law attempts to remove from employers' decisionmaking.

When power and status are distributed unevenly, administrators may sometimes view members of some groups as more easily expendable than others—either because of some misplaced notion of inferiority or because some groups with less power cannot protest adverse treatment as effectively. Managers of all races and genders in a culture arguably still permeated with racist and sexist stereotyping may discern that a decision to take adverse action against a member of a disfavored group will spawn less opposition, will be greeted with less protest or criticism, or will create less friction among people who "count." When exercising some degree of authority within institutions still dominated by white males, members of traditionally disfavored groups may feel extra pressure to show they are not soft on members of their own group. Furthermore, members of traditionally outsider groups may themselves inculcate some of the messages of inferiority that the dominant culture transmits. *Cf. Castaneda v. Partida,* 430 U.S. 482, 503 & n.n. 2, 3, 97 S.Ct. 1272, 1284, & n.n. 2, 3, 51 L.Ed.2d 498 (Marshall, J., concurring) (adopting majority's negative attitudes is a frequent response to discrimination and prejudice); *see also Brown v. Board of Education,* 347 U.S. 483, 494 & n. 11, 74 S.Ct. 686, 691 & n. 11, 98 L.Ed. 873 (1954).

The potentially subtle nature of discrimination is one reason that courts permit plaintiffs to mount their proof indirectly. Courts have acknowledged, at least in ADEA cases, that discrimination can be unconscious. *See Oxman v. WLS–TV,* 846 F.2d 448, 453 (7th Cir.1988); *La Montagne v. American Convenience Products, Inc.,* 750 F.2d 1405, 1409–10 (7th Cir.1984) ("[a]ge discrimination may be subtle and even unconscious").

■ Nor does the age and gender of plaintiff's replacement prevent a finding of age or sex discrimination. While plaintiffs can strengthen their case when they show the employer chose replacements from outside their protected class, failure to make that showing does not require judgment for the employer. The critical inquiry is

---

11. The employer may disagree, as it maintains it fired plaintiff for just cause. However, this element of the *prima facie* case may be established by plaintiff's testimony alone. *See Williams v. Williams Electronics, Inc.,* 856 F.2d 920, 923 n. 6 (7th Cir.1988) ("A determination that an individual is performing a job well enough to meet an employer's legitimate expectations, when made in the context of a *prima facie* case, may be based solely upon the employee's testimony concerning the quality of his work"). *See also Weihaupt v. American Medical Association,* 874 F.2d 419, 428 (7th Cir.1989).

the employer's motivation at the time of the firing. *See Price Waterhouse v. Hopkins*, —— U.S. ——, 109 S.Ct. 1775, 1785, 104 L.Ed.2d 268 (1989). In the case at bar, the plaintiff's position remained open for five months. The employer's choice of applicants in May is not that probative of the employer's motivation five months earlier. The employer's discriminatory purpose, if there was one, could have been stymied by lack of suitable younger replacements, and the subsequent hiring decision may have been influenced by the fact that plaintiff had already advanced charges of age and sex discrimination. The fact that defendant later hired members of plaintiff's protected class is simply not conclusive. *Cf. Furnco Construction Corp. v. Waters*, 438 U.S. 567, 579, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978).

▮▮▮ Plaintiff has thus stated a *prima facie* case of both age and sex discrimination. This creates an inference that the defendant fired plaintiff for impermissible reasons. In response, defendant asserts that plaintiff's age and sex had nothing to do with its decision to fire her. By asserting that plaintiff was fired for insubordination, defendant has advanced a legitimate non-discriminatory explanation. The inference of discrimination created by the *prima facie* case thus disappears.

The inference of discrimination returns, however, if plaintiff can show that the explanation advanced by defendant is not the true reason for the firing. In *Grohs v. Gold Bond Building Products*, 859 F.2d 1283, 1286 (7th Cir.1988), the court explained that a plaintiff can demonstrate pretext by showing that the proffered reasons had no basis in fact, did not actually motivate the discharge, or were insufficient to motivate firing. In this case plaintiff offers evidence that support a finding of pretext on all three prongs of the test delineated in *Grohs*. Viewing the facts in the light most favorable to the plaintiff, it is possible to regard Vestal's conclusion, that plaintiff was insubordinate by deliber-

ately filling unbudgeted positions without authorization, as not reasonably based on the facts known to Vestal at the time.[12] Second, there is evidence that the alleged insubordination was not the reason Vestal wanted to fire plaintiff. On the contrary, plaintiff will testify that the explanation first offered was that the Institute of Psychiatry needed to be revamped and that Vestal regarded her as too attached to old ways of operating. Third, plaintiff can offer evidence that the problems that Vestal claims prompted the discharge were, at most, a result of poor communication and did not merit an action so severe as abrupt termination. In sum, we believe that there remains a genuine issue of material fact whether plaintiff's alleged insubordination actually motivated the discharge.

Because the *prima facie* cases permits the factfinder to infer that impermissible discrimination occurred, and because that inference returns if the factfinder concludes that the employer's proffered explanation is not credible, a mechanical application of the *McDonnell Douglas* test would thus suggest that plaintiff automatically survives defendant's motion for summary judgment on the claims of both age and sex discrimination. This approach recognizes that an employer may be held liable simply for lying about the real reason for discharging a member of a class protected by federal discrimination laws, and, indeed, there is authority for such a result. The Seventh Circuit has recognized that the opportunity to show pretext means that a plaintiff who has successfully presented a *prima facie* case may prevail simply because the employer has concealed the real reason for its employment decision. *See Graefenhain v. Pabst Brewing*, 827 F.2d 13, 18 n. 7 (7th Cir.1987), *overruled on other grounds, Coston v. Plitt Theatres, Inc.*, 860 F.2d 834, 836 (7th Cir.), *cert. denied*, 485 U.S. 1007, 108 S.Ct. 1471, 99 L.Ed.2d 700 (1988). *See also Chipollini v. Spencer Gifts Inc.*, 814 F.2d 893, 899 (3d Cir.) ("A defendant which is less than honest in proffering its reason for discharge

12. While an unreasonable belief that the plaintiff was insubordinate may be genuinely held, and thus not a pretext, we presume that Vestal

is a reasonable person whose conclusions are reasonably based on the data available to her.

risks an unnecessary ... discrimination verdict"), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987).[13]

There are problems with such a mechanical approach to the *McDonnell Douglas* formulation. First, every person, white or black, male or female, is a member of a class protected by Title VII. Some courts, recognizing that the Supreme Court first formulated the lenient *McDonnell Douglas* test for plaintiffs from historically disfavored groups, have required white male plaintiffs alleging so-called "reverse discrimination" to meet a tougher standard in establishing their *prima facie* case. *See e.g. Bishopp v. District of Columbia,* 788 F.2d 781, 786 (D.C.Cir.1986). In this case, however, the plaintiff is a woman, and women have historically endured discrimination in the workplace. Yet there is a second problem with mechanically applying the *McDonnell Douglas* approach. It requires employers to face a trial whenever they have not advanced their real reasons for firing a protected employee who can assert adequate job performance. It is doubtful that Congress intended that Title VII require employers to produce, at the risk of a full-fledged trial and civil liability, their true reasons for firing employees when those true reasons have nothing to do with race or sex discrimination. "Title VII does not compel every employer to have a good reason for its deeds; it is not a civil service statute." *Benzies v. Illinois Dept. of Mental Health,* 810 F.2d 146, 148 (7th Cir.), *cert. denied,* 483 U.S. 1006, 107 S.Ct. 3231, 97 L.Ed.2d 737 (1987).

Although the *prima facie* cases raise an inference of discrimination, the factfinder is not compelled to award victory to the plaintiff simply because the employer has not been candid about the real reason for the firing. *Id.* At trial, the *McDonnell Douglas* framework does no more than guarantee that the factfinder must decide the ultimate issue: did the employer base its action on an impermissible factor. The plaintiff bears the ultimate burden of proof, and the mere inference created by the *prima facie* case does not necessarily sustain that burden. *United States Postal Service Bd. of Govs. v. Aikens,* 460 U.S. 711, 714–15, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983). Even if the employer lies about the real reasons for the firing, other reasons, not impermissible under federal law, might be suggested by the evidence. Courts in discrimination cases have consequently been taking a more critical look when plaintiffs attempt to survive summary judgment by simply pointing out that they have established a *prima facie* case and raised a question of pretext. Courts have looked for additional evidence that would permit a rational finder of fact to conclude, by a preponderance of all the evidence that will be heard at trial, that the employer acted on the basis of impermissible considerations. The Seventh Circuit has suggested that courts consider whether the state of the evidence is such that, if the case were tried tomorrow, the plaintiff had a fair chance of prevailing. *See Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572–73 (7th Cir.1989).

The evidence of sex discrimination in this case is slim. Although there is evidence that the employer's proffered reason is not the real reason for the firing, this is not a case where a showing of pretext necessarily eliminates all lawful explanations. Even if a factfinder did not believe that the alleged insubordination motivated the firing, the record as a whole suggests explanations other than sex discrimination. Financial pressure to reduce expenses in the hospital, the efforts of new management to assert their authority in a department staffed by long-time employees, an actual and irremediable loss of trust caused by a possibly mistaken but good-faith conclusion that plaintiff was insubordinate, or even discrimination based on age (see below) are alternative explanations with support in the record.

---

**13.** Indeed, Justice Blackmun has written that the plaintiff *must* prevail if the factfinder refuses to believe the employer's proffered explanation. *See United States Postal Bd. of Govs. v.* *Aikens,* 460 U.S. 711, 718, 103 S.Ct. 1478, 1483, 75 L.Ed.2d 403 (1983) (Blackmun, J., concurring). The *Aikens* majority, however, did not take this position.

For a finding of sex discrimination in this case the plaintiff cannot carry her ultimate burden of proof merely by showing that she is female and was performing her job well. We need something more. In the pleadings and in the depositions there is some indication that plaintiff contends that similarly situated males were not fired summarily but were treated more favorably and offered severance pay. Such evidence might be sufficient additional evidence of sex discrimination to survive defendant's motion for summary judgment. Yet plaintiff failed to mention any of this additional evidence in her statement of additional facts under Local Rule 12(m). We must evaluate the motion for summary judgment accordingly.

Plaintiff asserts the theory that as the only woman on the steering committee of the Institute of Psychiatry, she was the easiest and most expendable person to single out for adverse action as part of the power struggle between the hospital administration and the Institute. Plaintiff's close association with Dr. Visotsky lends some support to this theory, and so does plaintiff's testimony that Vestal announced plaintiff's termination a day earlier than planned because Dr. Visotsky was "interfering." Faced with complicated facts that can only emerge in full color from the testimony of a variety of witnesses with varying interests and motivations, we cannot say, on the basis of this cold record, that as a matter of law plaintiff has no fair chance of prevailing at trial. Although this case is close, we believe that plaintiff has presented enough evidence to squeak by. Defendant's motion for summary judgment on count I is therefore denied.

Plaintiff's theory of age discrimination is supported by the same evidence of pretext, the same evidence of the power struggle between the hospital administration and the Institute of Psychiatry, but is also supported by some additional evidence. The administration's concern with the Institute's expenses, especially the administration's view that Institute staff were overpaid, supports a finding that the hospital could be motivated by a desire to replace plaintiff with a lower-paid employee.

There is evidence that Vestal wanted to fire plaintiff because asking her to oversee the Institute's revamping would be like "asking a mother to change the children she has raised" (Veatch dep. at 278). This evidence may simply reflect the efforts of new management to clean house. *Cf. Grohs v. Gold Bond Building Products*, 859 F.2d 1283 (7th Cir.1988). Viewed in the light most favorable to plaintiff and in the context of all the evidence, however, Vestal's statement could reflect a view that plaintiff was too old, had been around too long, and needed to be replaced not simply with new management, but with younger and cheaper management.

The age discrimination count is also a close case with a complicated mosaic of facts. Yet, when viewing these facts and their reasonable inferences in the light most favorable to the plaintiff, we cannot rule out the possibility that a rational trier could conclude that impermissible factors motivated the employer's decision to fire plaintiff. Summary judgment is therefore inappropriate. Defendant's motion to dismiss count II is therefore denied.

### B. *Count III*

■ Defendant's chief executive officer has admitted that plaintiff was not an employee-at-will—she could be fired only for cause (Mecklenburg dep. at 26). The parties dispute the terms of the contractual relationship and do not agree about what procedural protections the defendant was contractually obligated to provide when employees of plaintiff's rank became the subject of disciplinary accusations. The terms of plaintiff's contract can be determined at trial. Because the question of whether plaintiff was properly dismissed for just cause remains an unresolved issue of material fact, summary judgment is inappropriate. Defendant's motion to dismiss count III is therefore denied.

### C. *Defamation*

■ The parties agree that under Illinois law plaintiffs must file defamation actions

within one year. Ill.Rev.Stat. ch. 110, ¶ 13–201 (1987). Plaintiff did not assert a defamation claim until she filed her first amended complaint on January 23, 1989.[14] Plaintiff does not argue that the original complaint provided notice of the facts comprising the defamation claim, so there is no question whether the filing of the defamation count in the first amended complaint relates back to the date of the original filing. Therefore, the only actionable defamations are those that occurred in the year before the amended complaint was filed. Plaintiff thus cannot recover for any defamatory statements allegedly made before January 23, 1988.

In her complaint and deposition, plaintiff does not describe with sufficient specificity any allegedly defamatory statements made after January, 1988. Defendant cites Illinois cases that require plaintiffs to specify clearly what words plaintiff claims create a cause of action. Plaintiff does not respond to defendant's argument. We note further that plaintiff has failed to set out in her 12(m) statement any facts that support the defamation claim. Accordingly, defendant's motion to dismiss count V is granted.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment on counts I, II, and III is denied. Defendant's motion to dismiss count V is granted.

14. The defendant says that the date of filing was January 26, 1989. The docket shows the filing occurred on January 31. The three-day or six-day difference does not affect our resolution of this case.