**Jay V. BUSH, Plaintiff,**

**v.**

**COMMONWEALTH EDISON CO., Defendant.**

**No. 89 C 652.**

United States District Court, N.D. Illinois, E.D.

Nov. 25, 1991.

---

Jay V. Bush, pro se.

Randall Schmidt, Mandell Legal Aid Clinic, Robert R. Cohen, Chicago, Ill., for plaintiff.

Linzey D. Jones, Pamela B. Strobel, Sidley & Austin, Jean F. Holloway, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Commonwealth Edison Co. ("Edison") has moved for summary judgment on all three of plaintiff Jay Bush's causes of action as alleged in his second amended complaint—namely, his assertions of discriminatory discharge under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17 (1988) (Count I), discriminatory failure to promote under 42 U.S.C. § 1981 (1988) (Count II), and state statutory and common law retaliation (Count III). For the reasons set forth below, we grant the motion for summary judgment on all three counts.

### I. Summary Judgment Standard

Under the Federal Rules of Civil Procedure, summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). This standard places the initial burden on the moving party to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Rule 56(c)). Once the moving party has done this, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

The non-moving party's burden at that point entails more than the mere raising of " 'some metaphysical doubt as to the material facts.' " *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir.1988) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (footnote omitted)). A genuine issue is created for trial only when the non-moving party presents sufficient factual allegations to enable a rational trier of fact to find in its favor. If it fails to shoulder this burden, summary judgment should be granted. *Id.; see also Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312 (7th Cir.1989).

### II. Factual Background

The following facts are undisputed, except as noted. Edison hired Bush as a garageman in its transportation department on November 13, 1978. Less than two years later, the company promoted Bush to the position of "B" mechanic, or "repairman." As a "B" mechanic, Bush did engine and brake repairs, suspension

and front end work, and body work on Edison vehicles.

On June 18, 1982, Bush injured his knee at work. While the circumstances are not directly relevant because Edison admits that the injury "was industrially-related," it appears that Bush, attempting to dismount after retrieving something from the cab of a truck, put his foot down on a wheel hoist instead of the truck's running board. When he stepped on the hoist, his foot slipped and he injured his knee.

Edison placed Bush on restricted duty from June 23, 1982 until approximately July 7, 1982 as a result of his injury. These restrictions included instructions that Bush was not to climb, kneel, or squat. Bush also underwent a program of physical therapy at a clinic in Hammond, Indiana, and supplemented that therapy with home exercises. Although his knee continued to bother him after his medical restrictions were lifted, he thought that the knee would eventually recover.

Nearly a year and a half later, on December 9, 1983, Bush again injured his knee. According to him, his knee gave out while he was climbing some stairs. Edison characterizes the incident as a "reinjury," whereas Bush objects to the "use of the word reinjured to the extent [Edison] means to imply that Mr. Bush's knee problems on or about December 9, 1983 were not related to the injury on June 18, 1982." That dispute is significant only insofar as it tends to obscure the way Edison handled the injury, as explained below. Edison placed Bush on restricted duty on December 12, 1983. Meanwhile, Bush had seen a doctor, who scheduled an arthrogram for January 12, 1984 to more fully investigate the extent of the damage.

The arthrogram disclosed that Bush had suffered a torn anterior cruciate ligament and some cartilage damage. The doctor advised Bush that these conditions required surgery. Bush assented, and surgery was performed on January 16, 1984. Bush did not return to work until July 6, 1984.

Edison initially treated the December 9, 1983 injury as non-industrial, which apparently meant that, at some point, it stopped paying Bush's medical bills and salary and, instead, referred those matters to Bush's insurance carrier. Bush, convinced that the injury was industrially related, eventually filed (and prevailed on) a workman's compensation claim against Edison, as we detail below.

Bush attempted to return to work on July 6, 1984, restricted to half days, but that lasted only until July 12, 1984. Experiencing a "pulling sensation in the knee," and some swelling, Bush consulted the doctor who performed his first surgery. The doctor recommended a second surgery to remove some staples that remained from the initial operation. That surgery was performed on August 14, 1984. Bush did not work between July 13, 1984 and October 21, 1984. According to Bush, Edison encouraged him during this time to concentrate on recovery, "to just try to get better and get back to work."

He returned to the job on October 22, 1984, again working only half days, with further restrictions against heavy lifting, kneeling, or stair climbing. Edison lifted those restrictions on November 1, 1984. Bush continued to undergo physical therapy three times a week, and, after a couple of months, felt that he had regained most of the strength in his knee. However, he missed twenty days of work between December 28, 1984 and January 28, 1985 to rest his knee and obtain additional medical opinions regarding a "popping" sensation.

Bush's ability to perform a "B" mechanic's regular duties following his return to Edison is disputed by the parties, although our perception of that dispute may be the product of Edison's incomplete version of the story. The company put Bush on restricted duty upon his return, and, without more explanation in its Rule 12(m) Statement of Facts, asserts that

> [u]nder these medical restrictions, Mr. Bush did not perform the regular duties of his mechanic's position, and he performed garage maintenance type activities and other make-work.

Rule 12(m) Statement ¶ 36. What Edison does not aver to is the fact that Bush had been released to work full days by March

25, 1985, and that he "resumed doing just about everything that Edison required" of "B" mechanics. Indeed, Bush claims that he

> basically did all the work [his] supervisors assigned to [him], including body work, lights, brakes, and other types of vehicle service. [He] even did work they assigned [him] that violated [his] restrictions, such as organizing the parts room, because of [his] eagerness to get back to real mechanic's work after being out so long with [his] knee injury.

Bush Affidavit ¶ 30; *see also* Rule 12(n) Statement ¶ 36.

For whatever reason, Edison apparently stopped assigning to Bush regular "B" mechanic-type duties in late April 1985. Bush's explanation is that, on or about April 29, one of his supervisors assigned him to place bumper stickers on every vehicle and piece of equipment in Edison's fleet. Bush told the supervisor that he felt the task would be too hard on his knee, involving as it did excessive bending and kneeling in violation of his work restrictions, and that he should not be required to do it. After some discussion, however, Bush agreed to perform the task and did so.

Two days later, the same supervisor directed Bush to *remove* all the stickers that had been affixed to Edison's vehicle and equipment fleet. Bush again informed the man that this would violate his medical restrictions, and this time declined to perform the task. Immediately following the sticker incident, Bush claims, his supervisors in the garage simply stopped assigning him any regular "B" mechanic's duties at all. "[T]hey would only assign me to tasks such as cleaning up the garage," he maintains. Moreover, "[n]o one ever offered me an explanation as to why I was not being assigned mechanic's jobs. any more." Bush Affidavit ¶ 46.

There is no question in Bush's mind that he was capable of performing his regular duties:

At this time (the end of April or the beginning of May 1985), there was no reason that I could not have continued to do the same work I had been doing since March 25, 1985. Further, over the month since May 25, 1985, I had not been talked to, warned or disciplined in any way because of poor work performance, nor was I ever told that my restrictions were interfering with my ability to accomplish my duties as a B [m]echanic.

*Id.* ¶ 47.

Conversely, Edison claims that it began evaluating Bush's physical limitations in April 1985 in an attempt to determine whether those limitations were permanent, and to investigate "the appropriate occupational placement for him." Bush disputes the latter half, and maintains that Edison's evaluation of appropriate occupational placement was flawed at best. Bush admits, however, that he saw an Edison doctor on May 8, 1985. The doctor, Bush says, took only a brief look at his knee and some X-rays.

Unable to resolve his differences with Edison over the nature of his December 9, 1983 knee injury (the company continued to maintain that the injury was not industrially related), Bush filed a worker's compensation claim on May 28, 1985. This action, he maintains, resulted in a marked change in Edison's treatment of and attitude toward him. For instance, he alleges that, a couple of days after he filed his claim, his primary supervisor in the garage said, within earshot of another Edison employee and referring to Bush, "That son of a bitch is suing us." *Id.* ¶ 52; Rule 12(n) Statement ¶ 57; Allen Affidavit ¶ 27.

It is undisputed that on July 25, 1985, one day after receiving a written report from the company doctor that examined Bush in early May, Edison demoted Bush to the "C" clerk position in its bill adjustment department.[1] The parties do dispute, however, the rationale behind that decision. Edison maintains that Bush was demoted "because [Edison] decided that the restric-

---

**1.** Edison's senior doctor relayed the examining doctor's conclusions to Bush on July 24, 1985. He told Bush that the examining doctor recom-mended permanent medical restrictions, and that Bush work only in a sedentary position.

tions resulting from his knee injury were permanent." Rule 12(m) Statement ¶ 57. Bush disagrees:

> As Plaintiff has consistently alleged throughout this case, [Edison]'s real reason for demoting Mr. Bush was in retaliation for his pursuing his Worker's Compensation Claim against them and because of his race. [Citations omitted]. As set forth above, [Edison] knew that Mr. Bush's injury was not permanent and that Mr. Bush could perform his regular work as a mechanic because Mr. Bush had been doing so since March 25, 1985. [Citations omitted]. In addition, Mr. Bush was not demoted until shortly after he filed his Worker's Compensation Claim....

Rule 12(n) Statement ¶ 57.

The demotion from "B" mechanic to "C" clerk entailed, among other things, a gradual wage decrease from $13.93 per hour to $8.64 per hour. A "C" clerk's duties included filing, distributing mail to other clerks, operating printing machines, passing out light bulbs to customers, and various paperwork.

On July 25, 1985, the same day of (but prior to) his demotion, Bush visited Dr. George Shybut at Northwestern Memorial Hospital. Dr. Shybut examined Bush, and told him that he could perform a new type of surgery on Bush's knee that would bring it back to at least 90% of its original strength. Knowing of this possibility, Bush asked at the "demotion" meeting later that day to stay in the transportation department as a "parts man" until he had the surgery and recovered. Bush's superiors denied this request. Bush also asked about the chances of returning to his "B" mechanic's position from the "C" clerk spot after recovery, and was told that "we [will] cross that bridge when we c[o]me to it."

Bush's first full day as a "C" clerk was July 26, 1985. He did not work between July 28, 1985 and August 26, 1985 because of injuries sustained in a car accident. Both parties agree that Bush was suspended from work on September 4, 1985, though they disagree on the story underlying that suspension.

Bush's version is that, on the morning of September 3, 1985, his former supervisor in the garage called him at home and told him to remove his tools from the garage immediately. Bush asked if someone at the garage could deliver the tools to his home, but that request was refused. Bush had some difficulty in lining up a truck to haul the tools away from the garage, and, noticing the lateness of the hour, called his new supervisor at the bill adjustment department to take the day off to move his tools. This request, Bush emphasizes, was only because the tool removal order was apparently so urgent.

Bush's new supervisor, Blaine Alsip, refused his request, and instructed Bush to report to work as usual. With conflicting instructions, Bush elected to remove his tools from the garage rather than report for work.

Edison's version of the September 3 events is similar, although it maintains that Alsip made arrangements with the garage to move Bush's tools for him. Bush denies that such arrangements were made, and claims that he "spent the day attempting to arrange to have my tools moved from the garage." [2]

The parties revisited the events of September 3 the next day. Edison suspended Bush for three days following a meeting involving Bush, Alsip, and various company and union officials.

Between September 9, 1985 (when Bush returned to work following the suspension) and November 4, 1985, Bush missed nineteen full work days due to still another knee surgery, and missed portions (two to four hours) of six other days because of court appearances or physical therapy. He was also tardy to work on five other occasions in that time period.

On November 4, 1985, Alsip met with Bush to "discuss his record of availability

**2.** We need not resolve this question, but it seems somewhat odd for Bush to have to arrange for the removal of the tools if Alsip had contacted the appropriate authorities in the garage in an effort to accomplish the same goal.

and tardiness;" Alsip warned Bush that "he had to improve his availability or he could face discipline." Rule 12(m) Statement ¶ 96.

Between November 5, 1985 and December 4, 1985, Bush missed one work day to go to court, and eight work days due to an unrelated illness. Alsip and other Edison officials met with Bush on December 4, 1985 to reiterate the earlier warning about availability.

On February 5, 1986, Bush was late to work because of car trouble. Edison maintains that Bush did not call in until almost noon to advise his supervisor of his situation; Bush claims that he called as soon as he got to the service station, and spoke to another person because Alsip was unavailable.

The next day Edison officials, including Alsip, again met with Bush. They again warned him that continued unavailability for work could result in discipline, including termination.

Between February 6, 1986 and March 6, 1986, Bush was tardy on three occasions. On March 6, 1986, still another meeting was held, with Alsip and Edison officials meeting with Bush and union officials to discuss Bush's unavailability. At that meeting, Bush's union representative asked about the chances of Bush returning to a position in the transportation department. Edison officials replied that it "considered Mr. Bush's future to be in the promotional opportunities provided in the customer service department and that [it] did not intend to return Mr. Bush to the Transportation Department." Rule 12(m) Statement ¶ 103. Edison suspended Bush for five days.

That same day, Bush visited Dr. Shybut. He asked the doctor if it was medically possible for him to return to his mechanic's position, explaining that the job involved a significant amount of heavy lifting and bending. After examining Bush's knee, Dr. Shybut told Bush that it would be no problem for him to return to work as a mechanic because his knee was "completely recovered." Bush Affidavit ¶ 87; *see also* Shybut Affidavit ¶¶ 7–8. Dr. Shybut also agreed to write a letter to Edison detailing

this medical clearance. Shybut Affidavit ¶ 8.

The parties dispute exactly what transpired regarding various communications between Edison and Dr. Shybut following that March 6 letter. Edison says that its doctor talked to Dr. Shybut on June 9, 1986 and was told that Bush "should not be returned to the Transportation Department at that time." Rule 12(m) Statement ¶ 106. Dr. Shybut denies ever telling Edison's doctor that Bush was unable to do mechanic's work. Shybut Affidavit ¶ 10. Further, Bush argues that Edison's story is not realistic, considering that Dr. Shybut wrote additional letters to Edison on June 30, 1986 and July 11, 1986 clearing Bush for mechanic's work.

On July 2, 1986, Edison offered Bush the option of having his knee examined by one of its doctors. The offer was made at a meeting between Bush and Edison officials during which Bush asked why he was not being permitted to return to the transportation department even though he had medical clearance to do so. Bush suggested an examination by a mutually acceptable doctor not on Edison's payroll. No further action was taken, although Edison characterizes Bush's posture as a "refus[al]" to see the company doctor. Rule 12(m) Statement ¶ 107.

On July 3, 1986, Bush was late arriving for work because he had car trouble. When he finally reported later that day, he was sent home pending an investigation. On July 7, 1986, Bush met yet another time with Edison officials who, having determined that Bush indeed had car trouble (Edison officials apparently visited the auto repair shop in question), warned Bush that "it was his responsibility to get to work on time." Rule 12(m) Statement ¶ 109.

Between September 4, 1986 and September 23, 1986, Bush missed one work day to go to court, and was tardy four other days. Edison fired Bush on September 23, 1986, for, it claims, "his total record." Bush maintains that his discharge stemmed from his race and in retaliation for his having filed and pursued a worker's compensation claim.

### III. Bush's Title VII Claim

The Seventh Circuit has identified certain special concerns we should be cognizant of as we address Edison's summary judgment motion on Bush's Title VII claim. Generally speaking,

> "summary judgment is infrequently an appropriate resolution" of a Title VII case. *Powers v. Dole*, 782 F.2d 689, 694 (7th Cir.1986). However, we have also recognized that summary judgment is not always inappropriate simply because issues of motive or intent are raised in the case. *See McMillian [v. Svetanoff]*, 878 F.2d [186], 188–89 [ (7th Cir.1989) ]; *Morgan [v. Harris Trust & Sav. Bank ]*, 867 F.2d [1023], 1026 [ (7th Cir.1989) (per curiam) ]; *Beard*, 840 F.2d at 410. Even when the issue of discriminatory intent is at stake, "summary judgment is proper 'where the plaintiff presents no indication of motive or intent supportive of his position.'" *Powers*, 782 F.2d at 694 (quoting *Munson v. Friske*, 754 F.2d 683, 690 (7th Cir.1985)). We must, however, approach the question of summary judgment with "special caution" in discrimination cases. *McMillian, supra*, 878 F.2d at 188; *Beard*, 840 F.2d at 410.

*Holland*, 883 F.2d at 1312–13. Thus, in determining whether Bush has raised a genuine issue of material fact with respect to his Title VII claim, "we must consider both the substantive law of employment discrimination and the burdens of proof applicable under this law." *Williams v. Williams Elecs., Inc.*, 856 F.2d 920, 922 (7th Cir.1988).

What has been described by one court in this district as the *McDonnell Douglas*[3] and *Burdine*[4] "ping-pong approach" to Title VII claims plays out in this fashion. Initially, Bush must

> establish a prima facie case by showing that (1) he was a member of a protected class, (2) he was satisfactorily performing the duties of his position, (3) he was terminated despite such performance and (4) [his employer] sought a replacement for him (*Jones v. Jones Brothers Con-*

*struction Corp.*, 879 F.2d 295, 299 (7th Cir.1989)). If he succeeds in making that showing, the burden shifts to [his employer] to articulate a legitimate reason for [Bush's] termination. Finally, if [his employer] meets that burden, [Bush] must show that [the employer's] stated and apparently legitimate reasons for terminating him were a mere pretext for race discrimination.

*Williams v. Caterpillar, Inc.*, 1991 WL 113189, at *3, 1991 U.S.Dist. LEXIS 8356, at *9–*10 (N.D.Ill. June 20, 1991) (footnote omitted).

■ We believe that Judge Milton I. Shadur's approach in *Williams v. Caterpillar* correctly eliminates needless repetition where, as here, "the parties' analysis most often focuses almost exclusively on the intimate daily details of the employee's performance on the job." *Id.* 1991 WL 113189, at *4, 1991 U.S.Dist. LEXIS 8356, at *10. Judge Shadur, following *Holmberg v. Baxter Healthcare Corp.*, 901 F.2d 1387, 1391 (7th Cir.1990), properly shifts the judicial inquiry immediately to the pretext stage, because "it is not necessary to decide whether the employee has met his ... burden of establishing a prima facie case if he ... cannot meet his burden of showing pretext...." *Id.* 1991 WL 113189, at *4, 1991 U.S.Dist. LEXIS 8356, at *11. This is particularly true since an employee can meet the prima facie showing of satisfactory job performance (sometimes phrased as "meeting the employer's legitimate expectations") simply by asserting that he is, in fact, performing his duties satisfactorily. *See Williams v. Williams Elecs.*, 856 F.2d at 923 n. 6 (citing *Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 512 (7th Cir.1986) (plaintiff's "testimony that the general quality of his work was satisfactory is sufficient to establish that he met the legitimate expectations of his employer [citation], and hence, to satisfy that element of the prima facie case")); *Williams v. Caterpillar*, 1991 WL 113189, at *4, 1991 U.S.Dist. LEXIS 8356, at *10–*11

---

3. 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

4. 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

(scrutiny of job performance a "much lower hurdle" at the prima facie stage; employee "can satisfy [that hurdle] with his ... own declarations") (citing *Williams v. Williams Elecs.*).

■ Bush can demonstrate that Edison's proffered reason for terminating him—that Bush was "repeatedly" made aware of Edison's expectations regarding work availability, and failed to meet those "plainly reasonable" expectations—was a pretext for racial discrimination if he can show that explanation is "incredible." *Williams v. Caterpillar*, 1991 WL 113189, at *4, 1991 U.S.Dist. LEXIS 8356, at *12 (citing *Oxman v. WLS–TV*, 846 F.2d 448, 453 (7th Cir.1988)).[5]

This Bush cannot do. Edison's requirement that Bush be on time to work is plainly reasonable, and even Bush admits that during the fourteen months he worked in the customer service department, he was marked late twenty times. Rule 12(n) Statement ¶ 172. Bush seeks to explain or justify those incidents by pointing out that twelve of those twenty tardies were for being five minutes or less late, and another four were for being between six and ten minutes late. *Id.* Unfortunately for Bush, this is the kind of employee-employer exchange that the employer "always wins ... at the pretext stage." *Williams v. Caterpillar*, 1991 WL 113189, at *4, 1991 U.S.Dist. LEXIS 8356, at *13 (citing *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464–65 (7th Cir.1986), *cert. denied*, 479 U.S. 1066, 107 S.Ct. 954, 93 L.Ed.2d 1002 (1987)).

An employee's burden to show that his employer's asserted justification for termination is actually only a pretext for racial discrimination is, in contrast to what we will accept at the prima facie stage, infinitely more rigorous: " 'In this regard, [the employee] must do more than challenge the judgment of his superiors through his own self-interested assertions. "[The employ-

ee's] perception of himself ... is not relevant. It is the perception of the decision maker which is relevant." ' " *Id.* (quoting *Dale*, 797 F.2d at 464–65 (quoting *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir.1980))).

Edison's perception in this case—which, again, Bush admits is accurate—is that its employee was frequently unavailable for work. That explanation for Bush's termination is to be given a large measure of credibility by the court, because we do

> "not sit as a super-personnel department that reexamines an entity's business decisions." *Dale*, 797 F.2d at 464. "No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [Title VII does] not interfere." [Citation omitted.] Rather, our inquiry is limited to "whether the employer gave an honest explanation of its behavior." *Id.*

*Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir.1988).

Edison's "explanation of its behavior" is "honest" in Title VII terms unless it was " 'a mask for discrimination on forbidden grounds such as race....' " *Williams v. Caterpillar*, 1991 WL 113189, at *6, 1991 U.S.Dist. LEXIS 8356, at *17 (quoting *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1571 (7th Cir.1989) (citations omitted)). As the Seventh Circuit has noted in an age discrimination context, an employer " 'can set unrealistic standards and fire an employee for not being able to meet them ... He can be as arbitrary as he wants—he just cannot treat an older employee more harshly than a younger one.' " *Id.* The race discrimination analogue, of course, is that an employer cannot treat a African-American (or Hispanic, etc.) employee more harshly than a Caucasian one.

Bush, like the plaintiff Williams in *Williams v. Caterpillar*, does attempt to

---

**5.** As Judge Shadur points out, *Oxman* outlines a second means of showing pretext: "by demonstrating 'that a discriminatory reason more likely than not motivated the employer....' " *Williams v. Caterpillar*, 1991 WL 113189, at *4, 1991 U.S.Dist. LEXIS 8356, at *12 (quoting *Oxman*). Like Williams, Bush has not presented

any direct evidence that race was a motivating factor in his employer's decision to fire him, and his indirect evidence (which we will discuss later) "does not rise to the level of 'more likely than not.' " *Id.* 1991 WL 113189, at *4 n. 5, 1991 U.S.Dist. LEXIS 8356, at *12 n. 5.

show that "white [employees] were not treated in the same manner as was he...." *Id.* We agree with Judge Shadur's determination that those efforts are an attempt to "call into play the mixed-motives analysis" of *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). *Id.* In other words, Bush would argue, Edison's proffered termination justification may have been "honest," but the company also impermissibly took Bush's race into account and "his race was the reason for terminating him and not terminating others who were similarly situated." *Id.* 1991 WL 113189, at *6, 1991 U.S. Dist. LEXIS 8356, at *18.

However, Bush misapprehends the nature of the *Price Waterhouse* test. Bush argues that Edison's summary judgment motion should be denied

> because the evidence is sufficient to establish that Mr. Bush's race was a substantial factor in Edison's decision. *Price Waterhouse....* In this case, Mr. Bush's evidence that he was treated inconsistently with White employees at least raises an issue of fact as to whether Mr. Bush's race played a substantial part in his discharge. [Citations omitted.]
>
> Thus, the burden of proof switches to Edison to prove that it would have fired Mr. Bush if his race had not played a part in its decision.

Response at 9–10; *see also* Second Amended Complaint ¶ 31.

Under *Price Waterhouse*, "a disparate treatment plaintiff must show by *direct evidence* that an illegitimate criterion was a substantial factor in the [employment] decision." *Price Waterhouse*, 490 U.S. at 276, 109 S.Ct. at 1804 (emphasis added) (O'Connor, J., concurring); *id.* at 259, 109 S.Ct. at 1795 (White, J., concurring). Bush has presented no direct evidence of racial discrimination, no "evidence sufficient to show that an illegitimate criterion was a substantial factor in the *particular employment decision* such that a reasonable fact-finder could draw an inference that the decision was made 'because of' the plaintiff's protected status." *Id.* at 278, 109

S.Ct. at 1805 (emphasis added) (O'Connor, J., concurring). Bush's suggestion that other employees with similar or worse work availability records were treated differently by Edison is by its very nature indirect evidence, subject to the "ping-pong" burden-shifting approach of earlier Supreme Court decisions.

Moreover, that indirect evidence is insufficient to save Bush's Title VII claims from summary judgment, particularly at the pretext stage. Essentially, Bush claims that evidence showing that from 1983 to 1987 all nine of the Edison customer service department employees discharged for disciplinary reasons were African-Americans tends to show, in turn, that Edison's stated reasons for discharging Bush are pretextual. Surreply at 7.

■ We find this statistical argument—which, at first, "appears to tell a dramatic story"—insufficiently reliable or meaningful. *See Soria v. Ozinga Bros., Inc.*, 704 F.2d 990, 994–95 (7th Cir.1983). Similarly "dramatic" statistics, when carefully scrutinized, were rejected by the Seventh Circuit in *Soria. Id.* at 995–99 (rejecting statistics in both disparate impact and disparate treatment contexts). Beyond whatever problem we might have with the inherent soundness of these statistics, though, is the absolute dearth of other evidence of racial discrimination. Giving Bush every benefit of the doubt, we might say that his statistics point to an inference of discrimination on Edison's part. This, however, is insufficient to discredit Edison's proffered nondiscriminatory reason for termination. *See Parker v. Federal Nat'l Mortgage Ass'n*, 741 F.2d 975, 980–81 (7th Cir.1984). Without "independent, direct grounds for disbelieving [an employer's] explanation for [an employee's] layoff," there is a stringent "degree of certainty" required of statistical evidence that is not as loose as the standard used when other "proof of discrimination besides a statistical pattern" is presented. *MacDissi v. Valmont Indus., Inc.*, 856 F.2d 1054, 1058 (8th Cir.1988) (distinguishing its case from *Parker*). Bush's evidence does not create a genuine issue of fact requiring resolution at a trial.

*Parker,* 741 F.2d at 980. Accordingly, we grant Edison's summary judgment motion as to Count I.

## IV. Bush's § 1981 Claim

▮ Count II of Bush's second amended complaint alleges a claim under 42 U.S.C. § 1981 (1988) based on Edison's decision not to promote or return him to the "B" mechanic position from the "C" clerk position. The statute provides that:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981. As we have pointed out in this case already, " 'By its plain terms, the relevant provision in § 1981 protects two rights: "the same right ... to make ... contracts" and "the same right ... to ... enforce contracts." ' " *Bush v. Commonwealth Edison Co.,* 732 F.Supp. 895, 897 (N.D.Ill.1990) (quoting *Patterson v. McLean Credit Union,* 491 U.S. 164, 176, 109 S.Ct. 2363, 2372, 105 L.Ed.2d 132 (1989)).

Bush again focuses on § 1981's right to make contracts. *Patterson* teaches that an employer's decision not to promote an employee may be actionable under § 1981 if

the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer. If so, then the employer's refusal to enter the new contract is actionable.... In making this determination, a lower court should give a fair and natural reading to the statutory phrase "the same right ... to make ... contracts," and should not strain in an undue manner the language of § 1981. Only where the promotion rises to the level of an opportunity for a new and distinct relation between the employee

and the employer is such a claim actionable under § 1981.

*Patterson,* 491 U.S. at 185, 109 S.Ct. at 2377.

The crux of Bush's § 1981 cause of action is the "separate and distinct" collective bargaining agreements governing the relationship of Edison to, on the one hand, its transportation department personnel, and, on the other hand, its customer service personnel. The words "separate and distinct" are, to be sure, not Bush's characterization, but that of William Ryan, the Industrial Relations Manager at Edison's Chicago South branch, where Bush worked. The following exchange at Ryan's deposition is illustrative. Discussing one of the notes from Bush's doctor releasing Bush to return to his mechanic's position, Ryan was asked these questions:

Q: And even with Jay's doctor releasing him from his restrictions, he still was not going to be transferred back to transportation[,] is that correct?

A: That's correct.

Q: You weren't even going to consider transferring him back to transportation?

A: Not at that point, no.

Q: And why was that?

A: Because—well, [among other factors,] Jay had no contractual rights to return to the transportation department.

Q: And what do you mean by no contractual rights to return to the transportation department?

A: He was now represented by Local Union 1427, which has no promotional ties with the transportation department.

Q: When Mr. Bush was transferred from transportation, did customer service—did he lose all of his seniority in the union that represented the workers in the transportation department?

A: With regard to any rights within transportation, yes. He had no more relationship with that group whatsoever.

. . . .

A: He had no rights whatsoever in transportation. By the time the transfer was accomplished, Jay had no future rights in transportation whatsoever. He was now a member of Local Union 1427,

which represents clerical customer service employees. He has absolutely no rights to exercise in transportation contractually.

Q: And that's under the collective bargaining agreements?

A: That's right. They're separate and distinct.

Ryan Deposition at 265–67 (Nov. 22, 1989).

Bush's assumption, however, that "separate and distinct" means "apples and oranges"—and thus that promotion from clerk to mechanic would create the opportunity for "a new and distinct relation"—fails to take into account the possibility that "separate and distinct" is merely a description of two oranges. Clerk and mechanic may be "distinct" jobs, and the collective bargaining agreements Edison has may also technically be "distinct," but that does not mean in this context that Bush has a cause of action under § 1981.

It is undisputed [6] that there are eighteen local unions within Edison, and that seventeen of these locals are affiliated with the International Brotherhood of Electrical Workers (I.B.E.W.) and are covered by one of five collective bargaining agreements. Rule 12(m) Statement ¶ 59.

The seventeen I.B.E.W. locals do not bargain separately with Edison. *Id.* ¶ 60. An entity known as the "System Council U–25" bargains collectively with Edison at the simultaneous expiration of all five collective bargaining agreements. *Id.* ¶ 61. The System Council U–25 is composed of representatives from each of the seventeen

I.B.E.W. locals. *Id.* ¶ 60. As negotiations progress on new collective bargaining agreements, a "Small Committee" (composed of three System Council U–25 representatives and three Edison representatives) "meet[s] to negotiate a mutually acceptable agreement that will govern all I.B.E.W. contracts." *Id.* ¶ 61. As Edison describes,

Once the "Small Committee" has concluded its negotiations, and with the approval of the Presidents of the 17 locals, a single Memorandum of Agreement governing all of the I.B.E.W. agreements is presented to the union membership for approval. A simple majority vote of all participating I.B.E.W. union members [at Edison] determines whether the proposed Memorandum Agreement will be ratified. . . . Thus, even if the majority of the union members in a particular I.B.E.W. local vote against the Memorandum Agreement, the Memorandum Agreement will still become a part of their local's agreement if the majority of all union members throughout [Edison] vote in favor of the Memorandum Agreement.

*Id.* ¶ 62.

In 1985, working under the same general procedures, I.B.E.W. union members at Edison accepted a Memorandum of Agreement, and the changes reflected therein were uniformly incorporated in all five of the I.B.E.W. collective bargaining agreements, including the collective bargaining agreements in effect between 1985 and 1988 for both Local Union 1367 (the trans-

---

6. Unless otherwise noted, Bush's only point of contention with Edison's description of the collective bargaining agreements and process is that Edison did not identify Ronald E. Langford, the company's director of labor relations during the relevant time periods, in response to interrogatories served on it. Edison's description is based on Langford's affidavit. To the extent that Bush's § 1981 claim is predicated on how this court should view the agreements and process as those agreements and that process are, we do not see how he has been prejudiced. That is, Bush's claim is that, given that the situation is "X," Edison's failure to promote him is actionable under § 1981. His argument is not that Edison's description is flawed.

To the extent that he is unable to make such an argument because of Edison's failure to iden-

tify, we note that Edison apparently did respond to Bush's request for a general identification of Langford (general identifications were provided in Exhibit A to Edison's response to Bush's first set of interrogatories), and, more importantly, Bush had between February 21, 1990 (the date Edison responded to Bush's second set of interrogatories) and July 17, 1991 (the date Bush responded to Edison's Rule 12(m) Statement of Facts) to either file a third set of interrogatories or, more directly, depose Langford (or, if necessary, seek leave of court to do so). After all, Edison's 12(m) Statement of Facts was filed April 26, 1991; Bush's response, with its discussion of the company's failure to identify, was filed nearly three months later.

portation department local) and Local Union 1427 (the customer service department local).  *Id.* ¶¶ 63–65.

Bush and Edison dispute whether or not the collective bargaining agreement in effect during the relevant time for local 1367 is, in fact, identical to that in effect for local 1427.  However, our own examination of the two agreements (attached to Langford's affidavit in Exhibit E to Edison's Rule 12(m) Statement of Facts) reveals that in all material respects the agreements are identical.[7]  The provisions of each agreement governing seniority, promotions, transfers, layoffs and reemployment rights of employees are materially the same, as are those provisions dealing with hours of work, overtime, holidays, working conditions, vacations, leaves of absence, wages, grievances, and more.  The only material difference between the two agreements is the particular positions and wage rates covered.

Beyond the I.B.E.W. agreements, Edison has certain work rules and practices which are applicable to all unionized employees.  These require employees to be available and on-time for work, and subject them to a progressive discipline scheme.  *Id.* ¶ 71.  Transfer between bargaining units does not obliterate an employee's length of service, used to determine entitlement to benefits (health insurance, vacations, pensions), or that employee's disciplinary record.  *Id.* ¶¶ 68, 72.

Thus, giving § 1981's right to make contracts language a "fair and natural reading," Bush cannot demonstrate that Edison's failure to promote him violates the statute.  Certainly "[a] transfer between divisions of a company does not automatically create a new employment relation...."  *McKnight v. General Motors Corp.*, 908 F.2d 104, 110 (7th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1306, 113 L.Ed.2d 241 (1991).  Even the facts that, arguably, the transportation and customer service departments are unrelated, and that Bush's responsibilities in the two

departments were "significantly different" does not create such a new relationship; what matters is not a change in jobs but a change in contractual status....  [T]he transfer of an executive from the accounting to the manufacturing division in the same plant is not [the kind of transfer envisioned as actionable under § 1981, like that from employee to officer or partner].  *Id.; see also Malhotra v. Cotter & Co.,* 1990 WL 208614, at *2–*3, 1990 U.S.Dist. LEXIS 16653, at *6–*7 (N.D.Ill. Dec. 4, 1990) (greater promotional opportunities in desired position(s) not characteristic "which would create a new and distinct relation").  And by now, of course, it is well-established that salary and job function differences do not suggest a new and distinct relation between the employer and the employee.  *Bush v. Commonwealth Edison Co.,* 732 F.Supp. at 898 ("Virtually every job change involves different duties and a different rate of pay; *Patterson* clearly did not intend every such claim to be actionable under § 1981.") (footnote omitted).

In short, because Bush has not alleged material differences that would amount to a new contract for § 1981 purposes, we grant Edison's motion for summary judgment on Count II.

### V.  Bush's Retaliatory Discharge Claim

Count III of Bush's second amended complaint alleges that Edison "retaliated" against him "by demoting him, failing to promote him and by discharging him," all in violation of state common law and the Illinois Worker's Compensation Act, Ill. Ann.Stat. ch. 48, para. 138.4 (Smith–Hurd 1991 Supp.).  Second Amended Complaint ¶¶ 93, 116.

■ As an initial matter, we grant Edison summary judgment on Bush's retaliation claim insofar as it goes beyond retaliatory discharge.  Illinois courts have not recognized a common law or statutory cause of action for retaliatory demotion or failure to promote.  *See, e.g., Dudycz v. City of Chicago,* 206 Ill.App.3d 128, 133,

---

7.  Bush, for what it is worth, does not allege that certain provisions of the agreements are materially different.  He alleges only that he can identify "several different provisions."  Rule 12(n) Statement ¶ 68.  These differences are not material.

151 Ill.Dec. 16, 20, 563 N.E.2d 1122, 1126 (1st Dist.1990) (common law cause of action for retaliatory discharge has "narrow parameters"), *appeal denied*, 136 Ill.2d 543, 153 Ill.Dec. 372, 567 N.E.2d 330 (1991); *Scheller v. Health Care Serv. Corp.*, 138 Ill.App.3d 219, 222–25, 92 Ill.Dec. 471, 473–75, 485 N.E.2d 26, 28–30 (4th Dist.1985) (state supreme court's interpretation of Worker's Compensation Act precludes expansion of retaliatory discharge cause of action beyond cases actually involving discharge); *see also Barr v. Kelso–Burnett Co.*, 106 Ill.2d 520, 528–29, 88 Ill.Dec. 628, 634, 478 N.E.2d 1354, 1358 (1985) ("In order to state a valid retaliatory-discharge cause of action, the plaintiff must allege that he was discharged in retaliation for his activities and that his discharge violates a clear mandate of public policy ....").

The only case cited by Bush in support of such a cause of action is *Hartman v. Board of Trustees of Community College Dist. No. 508*, 1991 WL 24519, at *6, 1991 U.S.Dist. LEXIS 1987, at *21 (N.D.Ill. Feb. 13, 1991). In that case, Judge William T. Hart's finding that "Illinois would recognize claims for retaliation short of a discharge" is explicitly grounded on the fact that the parties presented "[n]o good reason ... for why retaliatory discharge would be a recognized tort, but retaliatory demotion would not." *Id.* When, as here, the parties adequately brief the issue, Judge Hart and all other judges in this district (to our knowledge) reject the kind of extension Bush urges. *Willis v. Evans Prods. Co.*, 1987 WL 11337, at *4, 1987 U.S.Dist. LEXIS 4175, at *10–*11 (Hart, J.) ("no Illinois court has yet recognized a cause of action for retaliatory demotion," citing, *inter alia, Barr v. Kelso–Burnett Co.* and *Scheller v. Health Care Service Corp.*); *E.g., Ludwig v. C & A Wallcoverings, Inc.*, 750 F.Supp. 339, 342 (N.D.Ill. 1990) (Bua, J.) (retaliatory demotion not recognized by Illinois courts). Accordingly, summary judgment in Edison's favor is appropriate on Bush's retaliatory demotion and failure to promote branches in Count III.

■ As to Bush's retaliatory discharge claim, it is Edison's position that the Illinois Department of Employment Security ("IDES") "determined that Edison discharged Bush for 'misconduct' stemming from his habitual tardiness and absenteeism and that ... Bush was not entitled to unemployment compensation benefits." Memorandum at 18; Rule 12(m) Statement ¶ 119. Edison further argues that,

[u]nder Illinois law, this IDES determination constitutes *res judicata* on Bush's retaliatory discharge claim, where, as here, Bush had an opportunity to present, at a full hearing, any evidence he wanted to relating to his contentions regarding the reasons for his discharge and Edison bore the burden of establishing that Bush had engaged in "misconduct."

Memorandum at 18 (footnote and citations omitted).

In *Martinez v. Admiral Maintenance Service,* one of the cases cited by Edison in support of its position, the plaintiff's employer discharged her and she filed for unemployment benefits. *Martinez*, 157 Ill. App.3d 682, 683, 110 Ill.Dec. 91, 92, 510 N.E.2d 1122, 1123 (1st Dist.), *appeal denied*, 116 Ill.2d 561, 113 Ill.Dec. 302, 515 N.E.2d 111 (1987). The employer appealed a grant of unemployment benefits to a hearings referee of the Illinois Department of Labor. *Id.* The referee ruled that plaintiff had been discharged for " 'continued tardiness' " and " 'misconduct connected with work.' " *Id.* (quoting referee's decision).

Plaintiff appealed to the Board of Review, which affirmed the hearing referee's decision. *Id.* She then filed an action in state court alleging that she had been fired for exercising her rights under the state Worker's Compensation Act. *Id.* The state appellate court, affirming the trial court's decision, found that the administrative decision that plaintiff had not been wrongfully terminated acted to bar her state court claim that she had been retaliatorily discharged for asserting her legal rights. *Id.* 157 Ill.App.3d at 684, 110 Ill. Dec. at 684, 510 N.E.2d at 1124. The ap-

pellate court rightly found that *res judicata* barred the subsequent claim "not only as to all questions actually decided, but also as to all questions which could have been litigated in the action." *Id.* It also emphasized that

> [p]laintiff had an opportunity to raise her claim of retaliatory discharge before the Hearings Referee to show that defendant's charge of excessive tardiness was pretextual. Having failed to raise in [that forum] her contention that she was fired for filing a Workers' Compensation claim, plaintiff is precluded by *res judicata* from raising it now.

*Id.* at 685, 110 Ill.Dec. at 684, 510 N.E.2d at 1124.

Bush responds by maintaining that "Edison's argument must be rejected because the IDES' findings are privileged under § 1900 of the Illinois Unemployment Insurance Act," Ill.Ann.Stat. ch. 48, para. 640 (Smith–Hurd 1991 Supp.).[8] That contention has been rejected by at least one state court. *Colvett v. L. Karp & Sons, Inc.,* 211 Ill.App.3d 731, 734, 156 Ill.Dec. 135, 137–38, 570 N.E.2d 611, 613–14 (1st Dist. 1991). Explicitly following the holding in *Martinez,* the court in *Colvett* also noted that § 1900 talked about the confidentiality of information used in reaching the administrative decision, not about the confidentiality of the administrative decision itself:

> In 1989, the legislature amended section 1900, broadening the scope of the confidentiality of information obtained in [I]DES proceedings.... However, the legislature confined itself to the confidentiality of *information* received.... The Act has never stated nor suggested, and in our view wisely so, that a final decision of [I]DES would not be available in another proceeding. We believe that the legislature intended the term "infor-

mation" to include all investigative materials received from the parties during [I]DES proceedings. We also believe that a final [I]DES decision based on the evidence may be used in other proceedings in order to defeat attempts to relitigate such decisions.

*Id.*[9]

In short, then, the IDES determination that Bush had been discharged for misconduct is properly before us, and his retaliatory discharge claim is barred under the doctrine of *res judicata.* Bush is thus entitled to summary judgment on the remaining aspect of Count III.

### VI. Conclusion

Edison's motion for summary judgment is granted as to all three of the counts alleged in Bush's second amended complaint. On Count I, Bush cannot show that Edison's proffered reason for discharging him is unreasonable, not honestly held, or pretextual. Moreover, his statistics are meaningless when unaccompanied by independent grounds for disbelieving Edison's explanation of Bush's termination. On Count II, Bush has not alleged material differences between his contractual relationship with Edison as a repairman and his contractual relationship with the company as a customer service representative that would amount to a new contract for § 1981 purposes. Summary judgment is thus appropriate on the § 1981 claim in Count II. Finally, Edison is entitled to summary judgment on Count III because the doctrine of *res judicata* prevents this court from ignoring the prior adjudication of Bush's state retaliation claims before the IDES. It is so ordered.

---

8. Bush's motion in limine to exclude evidence of the findings and denial of benefits by the IDES referee is denied, for the reasons explained in the text of this memorandum order and opinion.

9. *Lowrance v. Marion Pepsi–Cola Bottling Co.,* 221 Ill.App.3d 623, 164 Ill.Dec. 162, 582 N.E.2d 725 (5th Dist. 1991), though it claims to reach a

result contrary to *Colvett,* actually holds that § 1900 would prohibit introduction into evidence of six documents used by the IDES in making its administrative decision. *Id.* at 625–28, 164 Ill.Dec. at 164–65, 582 N.E.2d at 727–28. The court does not attempt to dispute *Colvett's* finding that there is a difference between information received and the final decision—disclosure of the latter not violating § 1900.