**Robert DIAZ, Plaintiff,**

**v.**

**CITY OF SPRINGFIELD, Illinois, a municipal corporation, and the Joint Apprentice Training Committee for the City of Springfield, Illinois, Defendants.**

**No. 95–3111.**

United States District Court,
C.D. Illinois,
Springfield Division.

May 19, 1997.

James P. Baker, Springfield, IL, for Plaintiff.

---

Kevin J. Hubbart, Janis E. VonQualen, Robert M. Rogers, Theodore R. Schullian, Springfield, IL, for Defendants.

## OPINION

RICHARD MILLS, District Judge:

The world of electrical linemen is a tough one. Apprentice linemen are subjected to a "boot-camp environment," and treated with attendant profanity, obscenity, degradation and harassment.

·It is no place for the thin-skinned or the easily offended. It is a rough-and-tumble initiation into a demanding, dangerous and safety-conscious way of life, requiring a rigid adherence to teamwork and concern for your buddies on the job.

## I. BACKGROUND

### A. *Overview*

Robert Diaz, a Hispanic American, brought suit under Title VII of the. Civil Rights Act of 1964 protesting that his apprenticeship was canceled by the Joint Apprentice Training Committee for the City of Springfield ("JATC") which resulted in the termination of his employment with the Department of Public Utilities of the City of Springfield, Illinois ("City"). Diaz claims the aforementioned acts were motivated on the basis of improper considerations relating to his ancestry.

### B. *Theory of Liability*

#### 1. Against the JATC

Diaz's claim against the JATC is that the singular factor relied on by the JATC was the assessment of Diaz's performance as an apprentice made by the foremen and journeymen who evaluated him. Diaz claims that many of those foremen and journeymen who were critical of Diaz's performance were individuals who had a bias against him because of his Hispanic origin. Diaz claims the JATC delegated their responsibility of assessing and evaluating apprentices to the journeymen linemen and foremen. The JATC's decision to terminate Diaz's apprenticeship was a byproduct of that process and its decision turned upon those evaluations. Therefore, to the extent that any of the journeymen or foremen were motivated by improper discriminatory considerations in assessing Diaz's performance, their actions are imputable to the JATC.

#### 2. Against the City

Diaz's claim against the City is that the City's decision to terminate Diaz's employment was motivated by the cancellation of his apprenticeship. The City delegated to the JATC a significant degree of authority in overseeing and evaluating the adequacy of Diaz's employment with it. Under Title VII, an employer includes not only a person or firm which actually employs individuals, but the agent of such an entity as well. Accordingly, an individual or entity qualifies as an employer even if not actually employing a claimant if that entity serves in either a supervisory position or exercises significant control over the claimant's hiring, firing, or conditions of employment. In that situation, the individual operates as the alter ego of the employer and the employer is liable for unlawful employment practices of that entity or individual regardless of whether the employer knew of the unlawful conduct. Therefore, Diaz claims that the JATC and the journeymen and foremen who evaluated Diaz were the City's alter ego.

### C. *Facts*

The city provides electric services to its residents. It employs linemen who are members of the International Brotherhood of Electrical Workers. In order to become a journeyman lineman, an individual must undergo an accredited apprenticeship. The JATC oversees the apprenticeship of craft employees of the City, including linemen. The Board of the JATC is composed of union employees and management employees of the City.

The JATC selects the individuals to undergo an apprenticeship and also monitors the progress of apprentices to determine whether they have satisfactorily met the requirements to advance to journeyman status. It approves apprentices for advancement within the apprenticeship program and possesses

the authority to cancel an individual's apprenticeship.

The lineman apprenticeship program extends over a four year period. At the end of each year, an apprentice performing satisfactorily advances to the next year of his apprenticeship. An apprenticeship year may be, but is not necessarily, the equivalent of a calendar year. In order to advance from one year of an apprenticeship to the next, an apprentice lineman must perform at least two thousand hours of field work, attend the requisite hours of classroom training and receive satisfactory classroom scores, and receive satisfactory evaluations from the foremen and journeymen who work with him. The JATC does not employ any means of monitoring or testing the field performance of an apprentice other than to rely upon periodic evaluations of an apprentice which are made by journeymen linemen and foremen.

During the first three years of the program, an apprentice only works on secondary voltage (up to 440 volts). The tasks are repetitive and the apprentice is expected to exhibit increased knowledge, skill, autonomy and the ability to teach apprentices behind him in the program as he progresses through those years. In the fourth year of the apprenticeship, apprentices work on primary lines (440 to 12,500 volts).

Diaz began his apprenticeship with the City in 1987. In May 1991, after Diaz had been in the program three years and nine months and was in the third year of his apprenticeship, the JATC canceled his apprenticeship. The JATC concluded that Diaz had not satisfactorily progressed in his apprenticeship due to perceived performance shortcomings. Diaz had appeared before the JATC several times to discuss his poor work performance. The basis of the JATC's decision to cancel Diaz's apprenticeship was the evaluations of the journeymen and foremen who worked with Diaz. Based on the termination of Diaz's apprenticeship, the City terminated Diaz's employment with the City.

1. First Year Apprenticeship

Diaz worked for the City of Springfield from 1987 to May 10, 1991. In his first year

of the apprenticeship program, Diaz, like all apprentices, went to climbing school. But Diaz was injured during that training. Because the rest of his apprenticeship class completed climbing school, Diaz's final four days of training were conducted by Thomas McGrew, a journeyman lineman (now retired). McGrew's initial impression of Diaz was that Diaz did not know what he was getting into and that he was too small to do the work. McGrew testified that he was going to make those four days so tough that Diaz would either quit or would be a good climber. McGrew claimed Diaz did "doggone well."

From January 4, 1988 to February 9, 1988, Diaz worked on Bob Baker's crew. Diaz testified that Baker called him "Cuban asshole," "wetback," and "boat people." Diaz testified about an incident when he was made to jackhammer frozen dirt for two hours in 16 degree weather while the foreman stayed in the truck. Baker testified that this was not unusual because the apprentice always gets the undesirable duties.

On January 14, 1988, Diaz received a request from the JATC to attend the February 9, 1988 meeting to discuss the below-average apprenticeship reports. Ken Files and Real Coutu, two of the men Diaz had worked with to date, indicated that Diaz had some trouble with retention but that he had shown improvement. Diaz was held back from moving onto the second year of his apprenticeship for a period of three months.

From February 10, 1988 to March 31, 1988, Diaz worked on Mark Carlock's crew with Denver Eytchison as the journeyman lineman. Diaz claims he was called names just about every day but was provided with some training. Diaz claimed Carlock called him a "nigger inside out," a "Cuban homo," "a son of a bitch," "stupid," and "motherfucker."

The next crew Diaz worked on in his first year apprenticeship was Carl Giganti's crew. Diaz claims he was treated like a child and yelled at for any mistake. Dean Hill, the journeyman lineman, criticized Diaz and yelled.

From August 1, 1988 to January 27, 1989, Diaz worked on Ken File's crew. McGrew was a journeyman lineman on that crew. Diaz claims he was treated fairly and had the opportunity to learn a great deal.

### 2. Second Year Apprenticeship

Diaz's second year apprenticeship began in November 1988. He finished working on File's crew and then from January 30, 1989 to April 28, 1989 he worked again on Carlock's crew. Diaz claimed he got worse treatment under Carlock and was told that he would not get good evaluations like he did in File's crew. He stated that he was never given a job he could not perform, his supervisors never gave him suggestions, and that he had to learn from watching, but that he did whatever he was shown to do. Diaz stated that he did not see his evaluations. He claims Carlock continued to call him names and made comments about Diaz's wife and children.

In June 1989, the JATC requested a meeting. Diaz told the JATC that he thought he was doing well. He also told the JATC that derogatory comments were being made regarding his national origin and his family but he did not state who called him names. The minutes of the Board meeting reflect that the Board instructed Diaz to notify management the next time it happened and to not try to handle the situation himself.

Diaz spoke to George Perko, who in 1987–1991 was a Maintenance Supervisor and Assistant Superintendent. Diaz told him everything about the treatment he received but told Perko he wanted to keep it confidential. Perko set up a meeting for Diaz with Lois Wolff, the Personnel Manager. Diaz told Wolff the specific names he was being called. Wolff told him she would take care of the problem and that if he had any further problems, he should contact Perko. Wolff testified that she tried to explain to Diaz that the journeymen linemen were like "cowboys" and that they work in a "rough and tumble" environment that is not conducive to gentle or kind friendships. Diaz claims the treatment remained the same.

Jim Rechner, who gets involved in personnel when there is discrimination, testified that Diaz charged discrimination but refused to give names or incidents. Later, Lois Wolff called Rechner because Diaz complained about Carlock and Baker. Rechner, believing the issue was personal, scheduled a meeting with Baker, Diaz, Schrock and Rechner. The meeting took place in July 1989. Diaz and Baker shook hands after the meeting and Rechner thought the problem was over.

Diaz did not complain of discriminatory conduct again until January 1991.

From May 1, 1989 to July 28, 1989, Diaz worked on Don Baumhart's crew. Bob Baker was a journeyman lineman on the crew. Diaz claimed he continued to be treated poorly. Baker would drop materials on his head while they were both on a pole. A couple of times Baker nailed Diaz's belt to the pole. Diaz claimed the first year apprentice on the crew, Dave Hergget, was not abused or called names. Baker testified that he never purposely dropped materials on Diaz but did admit that several times he nailed his co-workers' belts to the pole (and may have done this to Diaz). He claimed that it was done as a joke and that he did not consider it unsafe nor was it done to endanger anyone.

### 3. Third Year Apprenticeship

Diaz worked on Ted Smith's crew from July 31, 1989 to October 30, 1989. Steve Duke, the journeyman lineman on the crew, allegedly made derogatory comments to Diaz, such as "not made in the USA," "wetback," and "Cuban asshole." Smith did not call Diaz names. The second year apprentice on the crew was Greg Bandy. Bandy was treated a little rough because he would not go up the pole and was ridiculed about his religion (he would not look at a "Playboy" magazine) but Diaz claims Bandy was not called names.

In October 1989, Diaz suffered a back injury and was out of work for 16 days. Thereafter, from October 30, 1989 to December 13, 1989, Diaz worked on Rick Gillespie's crew. Diaz claims Gillespie would not speak to him at all and Hill, the journeyman lineman on the crew, treated him badly. Diaz claimed

that while he was on this crew, he learned mostly from Fred Bisby, a fourth year apprentice. Diaz claimed Hill told him he would not teach Diaz line work because he was a Cuban and did not have to worry about being fired.

December 13, 1989 through February 5, 1990, Diaz was on Smith's crew with Duke as journeyman lineman. Diaz was again on Smith's crew from February 5, 1990 through May 8, 1990.

On May 10, 1990, Diaz was called before the JATC. Diaz claimed that at this meeting he was told for the first time that he had unsatisfactory evaluations but claims he was not shown the evaluations nor was he told what was wrong. He was told to talk to some of his evaluators. Diaz claims he did talk to his evaluators about his performance. The minutes from this meeting reflect that Diaz was told that his reports had consistently been unsatisfactory and that he would be held back six months in the program. He was also told that he would be closely monitored for improvement.

From May 1990 to August 1990, Diaz was on Carlock's crew (until Carlock was reassigned to other duties and on September 14, 1990, Daugherty became the permanent foreman of this crew). Diaz claimed he asked Carlock about his performance but that Carlock said that he had nothing to say because Diaz would not make it as a lineman. When Daugherty took over the foreman job from Carlock, Diaz tried to talk to Daugherty. Diaz claims Daugherty said "I already know all about you" and would not speak to him at all. Diaz claimed the fourth year apprentice on that crew, Fred Bisby (who became a journeyman lineman during the term of this crew) was not called names.

In October 1990, Diaz again met with the JATC. He was told that he had unsatisfactory evaluations and that he had not shown much improvement.

From November 5, 1990 through February 19, 1991, Diaz worked on Eytchison's crew. Diaz was called names every day. In one instance, Diaz claims Eytchison asked him to perform primary line work, which a third year apprentice is not allowed to perform. When Diaz refused, Eytchison got angry and called him a "son of a bitch" and a "Cuban asshole." Eytchison testified that he did ask Diaz to "go above primary [1]" once but that he asked him to use the bucket truck. Eytchison thought Diaz was capable and that it was not a safety hazard. When Diaz did not do as asked, Eytchison felt that Diaz was within his rights to decline.

Diaz appeared before the JATC in December 1990. Diaz was told that the Committee had not seen much improvement in his work evaluations and, if it continued, Diaz could be subject to disciplinary action or termination from the apprenticeship program. Diaz told the Committee that he disagreed with the content of the evaluations. At this meeting, Diaz admitted that he had not talked to the journeymen but that he would start doing so.

When Diaz questioned Eytchison about the negative evaluations, Diaz claims Eytchison just laughed and said "no reason." Charlie Riner, the journeyman lineman on that crew, also gave negative evaluations. Diaz asked Riner how he could improve, Riner stated that he did not know but that he thought Diaz had an attitude, that he cannot learn the trade, and that Diaz could not be fired because he was Cuban. Riner also allegedly said he did not trust Diaz because of the secondary fires he had.[2]

In January 1991, in reference to why a fence was being erected around some utility property, Carlock said it was being done to "keep out terrorists, like Bo [Diaz]." Diaz talked to Perko about the statement. Perko talked to Carlock and told Carlock that his statement was unacceptable behavior.

Diaz also demanded Perko give him a written test of some sort to demonstrate that Diaz did know what he was doing. Diaz claimed he did well. Diaz also testified that Perko never went to the job site to see how he was doing.

In February 1991, Joseph Zock, Secretary of the JATC, went to Diaz's job site to give

---

1. Work on lines situated over primary voltage lines.

2. A secondary fire is a short caused when wires cross/touch. It results in sparks.

him a letter telling him to meet with the JATC. When Diaz told Zock that things were not going well, Zock told him that if Diaz kept his mouth shut and did not get in any trouble, Diaz would make it through.

At the February JATC meeting, Diaz was again told that he had unsatisfactory reports and that he would be watched carefully. He was told that if he did not show substantial improvement, his apprenticeship would be canceled May 10, 1991. The Committee decided to hold him back from moving to the fourth year apprenticeship for a period of three months. Diaz claims that this time he was shown his evaluations. Diaz was told he would be rotated more frequently, which Diaz did not think was necessary because he thought he was learning at an acceptable rate.

From February 19 to February 26, 1991, Diaz worked on Smith's crew. Smith told him that he was not going to make it unless he listened to orders. This revolved around an incident in which Smith asked Diaz to dump rocks in a certain location. Diaz claimed he did not dump the rocks where he was told because the ground was too soft for the truck.

From February 27 to March 11, 1991, Diaz worked on File's crew. Diaz claims Files said he was doing fine. Files was not friendly but Diaz claims he was not abused.

On March 12, 1991, Diaz worked on Daugherty's crew for one day. From March 13 to March 15, 1991, Diaz worked on File's crew.

From March 18 to April 12, 1991, Diaz worked on Eytchison's crew. Eytchison did not speak to Diaz but occasionally called him "stupid." Diaz claims when he asked Eytchison how he was doing, Eytchison responded that Diaz had learned all he was going to learn as a third year. On April 15, 1991, Diaz worked for one day on File's crew. On April 18, 1991, Diaz worked on temporary foreman Gillespie's crew. From April 19 to May 10, 1991 (with the exception of May 9) Diaz worked on File's crew.

On May 8, 1991, Diaz had his last meeting with the JATC at their request. His evaluations were still not good.

On May 10, 1991, Diaz received his letter of termination. Diaz appealed to the Springfield Civil Service Commission, but the appeal was not successful. Subsequently, the City terminated Diaz's employment.

Diaz called witnesses on his behalf to testify as to the treatment he received and as to Diaz's capabilities. Matthew Small, now a journeyman lineman for CILCO, used to work for the City of Springfield and was in the same apprenticeship class as Diaz. He testified that first year apprentices received disrespectful treatment and that Diaz was treated the worst. Small witnessed the way Carlock and Eytchison treated Diaz. Diaz was told to "get on your boat and go back to Cuba" and told to "learn your English."

Small felt he (Small) was also treated different because he was black—that he was called "nigger" and told to "get his African bush feet up the pole." He thought that Diaz was treated worse perhaps because he was not as good as Small and perhaps because Small lived in Springfield all his life. Small fought back and eventually, years later, the hazing stopped. Small testified that Diaz was not lacking in anything, may have been a bit slower, but was safer. Small also claimed Diaz knew electricity and helped Small out at times.

Thomas McGrew also testified for Diaz. McGrew testified that while hazing was fairly common in the first year, Diaz was scrutinized more than the others. McGrew thought Carlock was especially hard on Diaz. McGrew testified that Hill called Diaz a "wetback" and that Hill did not think Diaz was good—that he thought a local could do the job (Diaz was from Rockford). The last time McGrew worked on the same crew with Diaz was July 1989.

Joseph Neece, a journeyman lineman, also testified as to Diaz's ability. He thought Diaz did a good job. Neece testified that he overheard a conversation in which Smith said to Daugherty that he did not know he was supposed to give a bad report, referring to Diaz. Neece appeared before the JATC on one occasion and told them that Diaz would make a good lineman for another company but not for the City because he was not being

given a chance with the City. Neece worked with Diaz during Diaz's second and third year of the apprenticeship program.

Paul O'Conner, a journeyman lineman, also testified that Diaz was treated poorly. He believed he overheard a conversation between Carlock and Eytchison in which one said "you're getting Diaz—make sure he gets bad reports."

Rico Johnson, who was an apprentice the same time as Diaz, also testified that Diaz was treated poorly. He did not observe Diaz having trouble following instructions and that Diaz was treated differently than the other apprentices. Johnson only worked with Diaz sporadically. Terry Burg, an apprentice from 1989 to 1994, claims Diaz was harassed and that Diaz was not given the opportunity to make mistakes or the opportunity to learn. Burg, who is a journeyman lineman now, claims that looking back, he would give Diaz a "good to great" rating.

### D. *Defendants' Case*

The Defendants called as witnesses many of the journeymen and foremen who worked on the crews with Diaz, as well as members of the JATC Board and members of Personnel. The Defendants' witnesses consistently brought up the same complaints about Diaz: he had trouble retaining things, he would not listen, he did not comprehend for the level where he was, he did not accept criticism well and he was hard-headed at times. Testimony from members of the Board indicated that they relied on the evaluations when they voted to terminate Diaz's apprenticeship. The journeymen and foremen stressed the need for safety on the job and expressed their concern that because of Diaz's shortcomings, safety could be compromised.

Dave Hergget, who worked on five or six crews with Diaz, testified that as a first year apprentice, he was razzed and teased and that profanity was used. During the second year of his apprenticeship, he still received razzing and teasing. By his third year, he was given more leeway but the razzing and teasing did continue. Hergget claimed that the harassment is a training experience like the military.

Hergget testified that Diaz was treated like the rest of the apprentices and that he did not hear comments about Diaz's nationality. Hergget testified that Diaz sometimes "butted" heads with the journeymen foremen, for instance, when he deviated from what he was told to do. Specific occasions Hergget could recall were when Diaz got yelled at for failing to make electrical leads and for climbing a rotten pole that he had failed to test.

On another occasion, Diaz was driving a truck and, playing around, would not let Baker merge into his lane. When Baker did get into the lane and stopped at a light, Baker got out of the truck, went over to Diaz, and said "Bo, don't be fucking around in traffic," and according to Diaz, hit him (according to Hergget and Baker, pulled the brim of his hat down). Diaz got very angry and said "fuck him he can't touch me, I'll cut him." Hergget claimed Diaz got out with a knife and said, "Come here, I'll cut you-Don't ever touch me." Hergget was not sure if Baker saw it. When Baker and Diaz arrived at headquarters, they had a shouting match.

Baker testified that a meeting was eventually set up between him, Rechner, Schrock and Diaz (the June 1989 meeting referenced above). Baker claimed Diaz admitted no racial remarks were made. Nonetheless, Baker was told that racial remarks would not be permitted. In Baker's opinion, he and Diaz had a cordial relationship after that.

Scott Schutte claimed that as an apprentice (1986–1990) he also got harassed and razzed. He was called "stupid" and "cocksucker." He claims he still gets razzed to this day. Schutte is now a journeyman lineman and he sees the teasing as a part of training. He saw his evaluations as an apprentice because they were handed out or, when the process became more formal, were available upstairs.

Schutte claimed Diaz was treated just like Schutte. The only difference Schutte recalled was Carlock went up the pole with Diaz, perhaps because Diaz needed more help. Looking back, and taking into account his experience as a journeyman lineman now, Schutte would rate Diaz below average. Schutte claimed Diaz would not do things the

way he was told to do them, that he had poor climbing, did not listen, exhibited poor overall ability, and was nervous in the air.

Defendants called each of the foremen who worked with Diaz. Carlock testified that the name-calling was part of the training. In Diaz's first year, Carlock thought Diaz was hardheaded but worked hard. In his second year, Carlock saw little difference than the first year—that Diaz did not grasp what he was taught. Carlock admitted that he told a joke: "What is a nigger turned inside out? A Cuban." Carlock claimed he never called Diaz that again and never called him any other names relating to his national origin and denied saying anything about Diaz's family.

Carlock testified that Diaz did read his evaluations and would say "bullshit" but never asked Carlock how he was doing. Carlock believed that Schutte was treated worse than anybody.

As for the fence building incident, Carlock admitted saying it was being built to keep terrorists like Bo out but he claims he meant it as a joke and that Diaz laughed. Perko talked to Carlock about it and Carlock said he did not say it to make fun of Diaz.

Carlock's impression was that Diaz was not doing fourth year work. One of his problems with Diaz was that Diaz questioned his methods, which is not the apprentices' role. Overall, he was not satisfied with Diaz's work because Diaz was not learning at an acceptable rate.

Bob Baker claimed Diaz had little respect for the foreman. For example, Baker testified that in Diaz's first year, Baker told Diaz he should be working with everyone else on unhooking the trailer. Diaz allegedly replied, "You can take a piss and wait on me." Baker claimed that while in his first year Diaz was on the same level as the other first year apprentices, by the third year, Diaz was below the level he should have been.

The members of the JATC Board testified that they relied on the evaluations when deciding whether to terminate Diaz's apprenticeship. The Board members found the evaluations to be unsatisfactory. Steve Hemstock testified that at the last JATC meeting, Diaz got terribly upset and interrupted the Board members. Hemstock had to tell Diaz to "sit down and shut up." He made the decision to terminate the apprenticeship based on the comments that Diaz did not retain information, he was argumentative, he did things his own way and he would not follow instructions. Testimony from other Board members was consistent.

## II. LEGAL STANDARD

To succeed under a claim of discrimination under Title VII, a plaintiff has two possible methods of proof: 1) the plaintiff can provide direct evidence of discrimination through direct or circumstantial evidence, or 2) the plaintiff can use the indirect, burden-shifting method of proof established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The latter is more common in discrimination suits. *Campbell v. Fasco Indus., Inc.,* 861 F.Supp. 1385 (N.D.Ill.1994), *aff'd* 67 F.3d 301 (7th Cir.1995). When direct evidence is used to show discrimination, the burden shifting analysis is inapposite. Once a plaintiff demonstrates disparate treatment through the direct method, a defendant must prove by a preponderance of the evidence that it would have made the same decision absent the impermissible factor. *Randle v. LaSalle Telecommunications, Inc.,* 876 F.2d 563, 568 (7th Cir.1989). Diaz in this case chose to proceed with the indirect method of proof.

The indirect, burden-shifting method of proof was established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under this method, the plaintiff must first establish a *prima facie* case for the discrimination alleged. Once plaintiff makes this showing, a rebuttable presumption of discrimination arises and the burden of production shifts to the defendant employer to articulate legitimate and nondiscriminatory reasons for the discharge. *Loyd v. Phillips Bros. Inc.,* 25

**1160**

F.3d 518 (7th Cir.1994). "If the defendant satisfies its burden of production, the presumption of discrimination dissolves, and the burden shifts back to the plaintiff to 'prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons but were a pretext for discrimination.'" *Campbell,* 861 F.Supp. at 1397, *citing Daugherity v. Traylor Bros. Inc.,* 970 F.2d 348, 354 (7th Cir.1992) (citations omitted).

## III.  ANALYSIS

### A.  *Prima Facie Case*

Defendants first argue that Diaz has failed to establish all the elements necessary to establish a *prima facie* case. To make a *prima facie* case of discriminatory discharge, Diaz must show: 1) that he is a member of a protected class; 2) that he was performing according to his employer's legitimate expectations; 3) that notwithstanding his performance he was discharged; and 4) that following his discharge the employer sought a replacement. Defendant claims Diaz has failed to establish that he was qualified and that he was replaced.

Defendants moved for a directed verdict after Plaintiff presented his case in chief claiming Diaz had not proven that his performance met the legitimate expectations of Defendants. The Court denied the motion[3]. Once the case has been tried on its merits, the Court should not dwell on the matter of the *prima facie* case. It is no longer relevant to the outcome of the litigation. *See Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94; *Andre v. Bendix Corp.,* 774 F.2d 786, 792 (7th Cir.1985); *Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1350 (7th Cir.1995).

### B.  *Legitimate, Nondiscriminatory Reason*

■ As Plaintiff points out, the JATC's decision to terminate Diaz's apprenticeship was based upon the reasons advanced to it by the journeymen and foremen who nega-

tively assessed Diaz's performance. Similarly, the City's decision to terminate Diaz's employment was also based upon those assessments. Therefore, the articulations the Court needs to focus on are those advanced by the linemen and the foremen who negatively assessed and evaluated his performance.

Those journeymen and linemen claim that Diaz exhibited poor job performance—that he was unable to retain knowledge about his line work, refused to take directions, and performed his duties in a substandard and unsafe fashion.

### C.  *Pretext*

■ Because Defendants provided a legitimate, nondiscriminatory reason for canceling Diaz's apprenticeship and terminating him, Diaz must persuade the Court that the explanation is pretextual. Diaz can discredit the Defendants' justification for its actions by demonstrating that: 1) the proffered reason had no basis in fact; 2) the proffered reason did not actually motivate the decision; or 3) the proffered reason was insufficient to motivate the decision. *Campbell,* 861 F.Supp. at 1389, *citing Grohs v. Gold Bond Bldg. Products,* 859 F.2d 1283, 1286 (7th Cir.1988), *cert. denied,* 490 U.S. 1036, 109 S.Ct. 1934, 104 L.Ed.2d 405 (1989).

Diaz claims the Defendants' explanation is pretextual and points to: 1) fact that the lineman's evaluations relied on in the spring of 1991 had little recent experience working with Diaz; 2) Diaz's treatment and the treatment of minorities in general; and 3) nonminority apprentices were treated differently.

### 1.  Evaluations

Diaz claims the Defendants relied on the evaluations of journeymen and foremen who had not recently worked with Diaz in making their decision to cancel his apprenticeship.

The evidence does not bear this out. From November 1990 to February 1991,

---

**3.** The Court notes that the initial burden of proof to show a prima facie case is not "onerous." *Veatch v. Northwestern Mem. Hosp.,* 730 F.Supp. 809, 818 (N.D.Ill.1990) (citations omitted), and

plaintiff can establish the elements through his own testimony, *Campbell,* 861 F.Supp. 1385 (N.D.Ill.1994).

Diaz worked with Eytchison as foreman and Riner as journeyman lineman. At the January 24 JATC meeting, the Board talked to Eytchison, Riner, and Smith[4]. At the February 14 JATC meeting, Carlock, Baumhart, Daugherty, Hill, and Duke attended. Diaz worked with Carlock most recently from May through August 1990; worked with Daugherty from September through November 1990; worked with Hill from May through November 1990. Diaz had not worked recently with Baumhart or Duke. At the May 8 meeting, the minutes reflect that the JATC considered the comments of Files, Eytchison, Ott, McGrew, Neece, Wade, Smith and Duke. Between January and May 1991, Diaz had worked with Eytchison, Files, Smith, Duke and Ott. In fact, those the Committee spoke to that had not worked with Diaz recently are the ones who gave Diaz a fairly good review. Wade had worked with Diaz when Diaz was on substation rotation (three to four years earlier) and stated that Diaz's work was good. Neece and McGrew had not worked with Diaz recently but both gave him a good review.

The reviews of those who had worked recently with Diaz consistently stated that Diaz did not listen and did not retain information. Also common were comments that Diaz did not take criticism well (he debated and argued) and gave excuses for his mistakes.

The Court does not find that the way the JATC considered the evaluations in any way demonstrates that the Defendants' stated reason was pretextual.

### 2. Treatment of Diaz

Diaz claims that the treatment he received from the foreman and journeymen linemen on the crew supports his claim that the Defendants' stated reason for his termination was pretextual. The Court disagrees.

Diaz testified to a number of names and comments directly at him by the journeymen linemen and foremen. These included: "wetback," "Cuban asshole", "stupid," "not made in the USA," "nigger turned inside out," "Cuban homo," "son of a bitch," and "motherfucker."

The fact that an occasional or sporadic slur directed at Diaz's national origin is generally not enough to support a claim under Title VII. *Hong v. Children's Memorial Hosp.*, 993 F.2d 1257, 1266 (7th Cir.1993). "[S]uch remarks, when unrelated to the decisional process, are insufficient to demonstrate that the employer relied on illegitimate criteria, even when such statements are uttered by a decision maker." *Id.* citing *Smith v. Firestone Tire and Rubber Company*, 875 F.2d 1325, 1330 (7th Cir.1989). The Court finds that Diaz has not demonstrated that the name-calling was related to the negative evaluations.

Defendants called to testify the journeymen linemen and foremen with whom Diaz worked. The Court was impressed by the intelligent and articulate testimony of the journeymen linemen and foremen. These are truly "cowboys of the new era." They work in a tough and dangerous environment. The dangerousness of their job is demonstrated by the fact in 1988 two men were electrocuted on the job. The Court finds that the harsh nature of the training program is designed to weed out the faint-hearted and to underscore the need for safety on the job. Undoubtedly, all apprentices are treated roughly and subjected to name-calling and abuse. Even Diaz's witnesses testified that they too were called names and abused.

The question here is whether Diaz was subjected to name-calling and abuse, and ultimately given bad evaluations, because of his *national origin.*

The Court believes he was not.

### 3. Other apprentices

Diaz pointed to two other non-minority apprentices, Greg Bandy and Ron Cunningham, claiming they received better treatment than Diaz. Diaz believed he was a better apprentice than Bandy (who was afraid of heights) but that Bandy was not terminated

---

**4.** The minutes of the meeting reflect that Daugherty was sick. Diaz worked on Daugherty's crew September through November 1990.

from the program. Baumhart, however, testified that Bandy was safer than Diaz and that all of Bandy's troubles stemmed from his fear of climbing but that he could do the work. Baumhart believed that Diaz could not work on his own and do so safely and correctly.

Ron Cunningham took seven to eight years to complete the apprenticeship program. Diaz claims Cunningham was not a good apprentice yet he was not terminated from the program. But, Baumhart claimed that Cunningham was not terminated from the program because he could work safely and learned from his mistakes. Diaz could not do so.

The Court finds Baumhart credible. The pattern of Diaz's problems is evident. Consistently, the evaluations indicate that Diaz did not retain information and did not learn from his mistakes. Moreover, Defendants presented evidence regarding the apprenticeship of non-minority Bob Skube, who exhibited performance deficiencies similar to Diaz, who was terminated from the program. And finally, other minorities have successfully completed the apprenticeship program and currently work as journeymen or foremen.

## IV. CONCLUSION

The Court finds that Diaz has failed to prove by a preponderance of the evidence that the legitimate reasons offered by the Defendants were not its true reasons but were a pretext for discrimination.

The Court finds for the Defendants and against the Plaintiffs. Judgment shall be entered accordingly.

SO ORDERED.

CASE CLOSED.